## FOWLE *v.* PARK.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF OHIO.

·No. 263. Argued April 17, 1889. — Decided May 13, 1889.

A contract relating to a patent medicine which communicates its ingredients in confidence, and provides in substance that the parties shall enjoy a monopoly of the sale of it, each within a defined region in the United States, and that it shall not be sold below a certain rate or price, is not unreasonable or invalid as in restraint of trade.

On the facts stated in the opinion : *Held,* that the defendants sold the balsam within the prohibited territory, or to those by whom to their knowledge it was to be there sold, and that, as the record disclosed violations of the contracts in these respects, the cause should have gone to a master to state an account.

THE case was stated by the court as follows :

Seth A. Fowle and Horace S. Fowle, citizens of Massachusetts, filed their bill of complaint against John D. Park, Ambro R. Park and Godfrey F. Park, citizens of Ohio, in the Circuit Court of the United States for the Southern District of Ohio, on the 28th day of March, A.D. 1884, alleging that in 1844 one Lewis Williams, of Philadelphia, "prepared, invented and compounded a certain· medicinal preparation of great and substantial value, for certain complaints and diseases, and assigned and adopted the name therefor of ' Wistar's Balsam of Wild Cherry,' he being then the sole proprietor and alone having knowledge of the nature and ingredients of said preparation ;" that in May, 1844, Willams " sold, assigned and transferred for valuable consideration to him paid, to one Isaac Butts of the State of New York, said preparation and a

full and true copy of the receipt for preparing the same, under the name of ' Wistar's Balsam of Wild Cherry,' with the sole and exclusive right to manufacture and sell the said medicine under said name or otherwise, in certain enumerated States, counties, etc. ; " that in March, 1845, said Isaac Butts, " for and in consideration of a large sum of money to him paid by Seth W. Fowle," sold, conveyed and transferred to Fowle, his heirs, assigns and personal representatives, " all his right, title and interest in and to said preparation, or medicine, and said receipt with a true copy thereof, with the sole and exclusive right to manufacture, sell and cause to be sold the said medicine in the States, provinces and counties above named, as included in said transfer by Lewis Williams to the said Isaac Butts ; " that at the time of said transfer, and as a condition thereof and part of the consideration therefor, Fowle agreed " that neither he nor his personal representatives or assigns would sell, cause to be sold, nor establish agencies for or be concerned in the sale of said balsam in any part of the United States, except those named in said transfer by Lewis Williams, and that neither he nor they would sell or cause to be sold said balsam anywhere for a less sum than seven dollars and $\frac{20}{100}$ of a dollar ($7.20) net for each and every dozen sold, or cause to be sold, except to agents for a whole State or Territory, in which case such agent should not sell below said rate ; " that all the rights thus acquired by Fowle passed to the plaintiffs by purchase and inheritance; that Fowle and plaintiffs as successors " have continued to manufacture from said receipt and sell said balsam under said name from the year 1845 in large quantities up to the present time throughout said Territory and not elsewhere, except west of the ridge of the Rocky Mountains, as hereinafter stated,". but have not sold below the stipulated price, and have expended great sums in establishing and increasing the business, and built up a large trade and good will in connection with the name " Wistar's Balsam of Wild Cherry," by which name their manufacture of said medicine has become largely known, they and the defendants herein being the only manufacturers thereof on the continent, and being the only parties except

Lucy A. S. Fowle, widow of said Seth W. Fowle, now having knowledge of the secret of its preparation; that about 1845 Williams disclosed the secret and mode of this preparation to Sanford and Park, and transferred to them a similar right to that given Butts to manufacture and sell said preparation "in certain parts of the then United States lying west of the territory included as aforesaid in said transfer to Seth W. Fowle," they agreeing not to sell on the territory of Butts, and the right so acquired by Sanford and Park subsequently passed to the defendant John D. Park, and the other defendants became interested therein through him; "that between the years 1849 and 1864, the portion of country between the Rocky Mountains and the Pacific having become largely a part of the United States, the said Seth W. Fowle and the said John D. Park both sold small quantities of said 'Wistar's Balsam of Wild Cherry' for some time in said territory in competition;" "that in 1864 said parties entered into a contract whereby it was agreed that the said Seth W. Fowle should have entire control of such sales in said territory west of the ridge of the Rocky Mountains free of all competition on the part of said John D. Park, the latter being paid a valuable consideration therefor by the said Fowle; that this arrangement continued until after the death of the said Fowle in A.D. 1867, and until on or about 1869, when the same terminated;" that in 1869 John D. Park entered into an agreement with Seth A. Fowle, one of the complainants, and Lucy A. S. Fowle, whereby, in consideration of $5000, he sold and transferred to them, their legal representatives and assigns, all interest in, or right to, the sale of said medicine west of the Rocky Mountains, and also all interest in or right to the good will of selling said balsam in said territory, and in the trade-mark on the labels, bottles, wrappers and packages containing said medicine, and in carrying on the business therein, said Park covenanting "for himself, his assigns and representatives, in said agreement, that the said Seth A. and Lucy A. S. Fowle and their assigns should have and enjoy the sole and exclusive right of selling said medicine within said limits," "free from any competition or interference by him or any one under him or by his author-

ity, permission, or aid, either directly or indirectly," etc. ; that in 1872, complainants acquired all the rights of Lucy A. S. Fowle in said contract of 1869 with said John D. Park; that the copartners of said John D. Park, defendants herein, "derived all their interest in, and right to, the manufacture and sale of said balsam since the execution of said contract of 1869 from said John D. Park, and with full knowledge and subject thereto;" that the defendants and each of them have failed to comply with the contract between Williams and San- ford and Park in that they have for ten years last past sold and caused to be sold, and sold with knowledge or reason to know that the same was to be resold, said balsam in the terri- tory comprised in the transfer to Butts, in large quantities in competition with complainants' trade, and have sold there and elsewhere at a less price than seven dollars per dozen, and have sold and caused to be sold said balsam in the territory described in the contract of 1869 with John D. Park, and at a lower price than seven dollars ; and that complainants had gone to large expense on the faith of that contract and built up a large and valuable trade throughout the entire Pacific coast with which defendants are interfering and injuring and damaging complainants as well as interfering with their busi- ness east of the Allegheny Mountains. The bill, waiving an oath, prays for answers, an injunction, and an accounting.

The defendants admit in their answer the invention of the medicinal preparation and its name and the sale by Williams to Butts and by Butts to Seth A. Fowle, and the sale by Williams to Sanford and Park, which the defendants say was made the year before the sale to Fowle; and that John D. Park purchased the rights of Sanford and Park. They call for a production of the agreement in 1864 between Seth W. Fowle and John D. Park ; they deny that they have sold any of the balsam in the territory transferred to Butts; they deny the sale of any balsam by them within the territory west of the Rocky Mountains named in the contract with John D. Park ; and deny that they ever sold the balsam any- where at less than seven dollars per dozen. They add to their answer averments, by way of cross-bill, in which they state

their exclusive right to manufacture and sell the balsam in those parts of the United States lying west of the territory included in the sale from Williams to Butts, as well as those States and counties named in the transfer of Williams to Sanford and Park, and assert that the Fowles, by putting up the medicine in packages containing less than eight liquid ounces, are selling the same for less than one-half of $7.20, and therefore the medicines of Fowle & Sons are sought for by dealers selling medicine in defendants' territory, who buy and resell the same to defendants' injury. They pray for answers, an oath not being waived, and that complainants may be enjoined from putting up for sale said medicine in packages of less size than those in use on the 1st day of March, 1845, the date of the contract between Butts and Fowle, and from selling packages of said medicine of whatever quantity at a less price than $7.20 per dozen, and for damages.

Complainants filed a replication to defendants' answer, and an answer under oath to their cross-bill, denying the assertion of the defendants that they had the exclusive right to manufacture and sell in all the territory of the United States lying west of that included in the sale and transfer from Williams to Butts, and averring that defendants had no right to manufacture or sell in any of the territory west of the ridge of the Rocky Mountains. They say that no size of package was stipulated for in the contract between Fowle and Butts, and that the object of the stipulation was, that the medicine should not be sold at a lower proportional rate than $7.20 for ten ounces, and that they had never sold at any less rate; that they have used a smaller size of bottle holding only four liquid ounces, but the lowest net price they ever charged for them has been at the rate of nine dollars per dozen bottles of ten ounces; and that no sales thereof have ever been made by them within the territory embraced in the contract between Williams and Sandford and Park, and such sales as have been made were made with full notice to defendants, with description and sample of bottle, and without objection, and they deny all injury to defendants. To this answer replication was duly filed.

The cause having been brought on for hearing, the agreement between Lewis Williams and Benjamin F. Sanford and John D. Park, dated May 1st, 1844; the agreement between Williams and Butts dated May 20, 1844; the agreement between Butts and Fowle, dated March 1st, 1845; the agreement between Fowle and Park, dated December 16, 1863; the agreement between John D. Park and Seth A. Fowle and Lucy Ann S. Fowle, dated November 17, 1869; the release of Lucy Ann S. Fowle to Seth A. Fowle, January 1st, 1873; as well as various letters of Fowle & Son in 1877 and 1878, to Park & Sons, and a letter from Park & Sons to Fowle & Son, in 1877; sundry invoices, bills, etc.; were put in evidence, together with the testimony of several witnesses bearing upon the question of sales by or with the knowledge of Park & Sons in the territory claimed by Fowle & Son.

The court found " that the complainants are not entitled to the relief prayed in their said bill of complaint," and thereupon dismissed complainants' bill at their costs, and the cross-bill of respondents at their costs, from which decree complainants prosecuted this appeal.

*Mr. Henry A. Morrill* for appellants. *Mr. Alexander H. McGuffey* was with him on the brief.

No appearance for appellees.

Mr. CHIEF JUSTICE FULLER delivered the opinion of the court.

No question arises in respect to the sale and transfer by Williams to Butts, and by Butts to Seth W. Fowle, and the acquisition by complainants of all the right, title and interest of the latter, nor as to the sale by Williams to Sanford and Park, and the passage of the title, interest, and rights of Sanford and Park to Park, and through him to his codefendants; and the agreement between Park and Fowle & Son, as to the territory west of the Rocky Mountains, is produced, and sustains the averments of the bill in that regard.

By the contract between Williams and Sanford and Park,

Williams, in consideration of the payment of $2500 by Sanford
and Park, and the covenants entered into on their part, sold
and transferred to Sanford and Park, a true copy of the
recipe used in preparing said Balsam of Wild Cherry, together
with the sole right to manufacture and sell said medicine in
Ohio, Indiana, Illinois, Kentucky, Tennessee, Missouri, Michi-
gan, Arkansas, Mississippi, Alabama, Louisiana, and all the
territory lying west of those States, together with certain
counties in the State of Virginia and certain counties in the
State of Pennsylvania, and Sanford and Park covenanted and
agreed to pay $2500 and $4764 for medicine consigned to
them for sale, and also "that they will not sell or cause to be
sold, or establish agencies for the sale of said balsam in any
part of the United States except in the States and Territories
herein granted to them, and also that they, the said Sanford
and Park, will not sell, or cause any of said medicine to be
sold, at less price than seven dollars for each and every dozen,
except to such persons as shall become their agents for a whole
State or Territory, and in all cases where such agencies are
granted they also promise and agree to take from such agents
an agreement, with a sufficient guaranty or penalty, that no
sales of said medicine shall be made at a less price than that
above named;" and Williams covenanted and agreed that he
would not "manufacture, sell, or cause to be sold, any of said
medicines within the territory herein granted to the said San-
ford and Park, or any medicines under a different name, pre-
pared from the same recipe used in preparing said balsam, or in
any other form purporting to be an improvement on the said
medicine," it being provided "that the said Sanford and Park
shall not make known to any person the ingredients employed
or manner of preparing said medicines." By a similar agree-
ment Williams sold and transferred to Butts the recipe and the
sole right to manufacture and sell said medicine in the six New
England States; also in the States of New York, New Jersey,
Delaware, Maryland, North and South Carolina, District of
Columbia, and British America, and certain counties in the
States of Pennsylvania and Virginia, for four thousand
dollars; and eight thousand six hundred and sixty-one dollars

for medicine consigned to him, the parties covenanting as in the agreement with Sanford and Park.

The contract between Butts and Fowle was similar in terms, the money consideration being twenty-nine thousand five hundred dollars, and some accounts, a stock of drugs, and some apparatus and stereotype plates being included in the purchase.

By the agreement between John D. Park and Seth A. Fowle and Lucy Ann S. Fowle, Park, in consideration of $5000, sold, assigned, transferred and conveyed to said Seth A. and Lucy Ann S. Fowle all his "right, title, interest and claim in and to the property or proprietary right or franchise of the medicine or medicinal preparation called and known as 'Wistar's Balsam of Wild Cherry,' for and so far as regards all the territory or part of North America lying westerly of the ridge of the Rocky Mountains, embracing the whole of the following States and Territories of the United States, viz., the States of California, Oregon and Nevada, and the Territories of Washington, Idaho, Utah, Arizona and Alaska, and so much and such parts of the Territories of Montana, Wyoming, Colorado and New Mexico as are westerly of the ridge of said Rocky Mountains meaning and intending all territory lying westerly of said Rocky Mountains (including the westerly slope thereof) and between said mountains and the Pacific Ocean, and also all my right, claim and interest in and to the good will of the business of making, putting up and selling said Wistar's Balsam of Wild Cherry within said limits, and in and to the trade-marks, so far as used within said limits, on the labels, bottles, wrappers, or packages containing said medicine, or otherwise used in carrying on said business within the limits or territory aforesaid;" also in all of British Columbia and Mexico; "intending hereby to transfer and relinquish to said Fowles the whole market for the said medicine of all said territory westerly of the Rocky Mountains, and also, (so far as I have the power so to do,) of all said British Columbia and Mexico, so that they and their legal representatives and assigns may have and enjoy the sole and exclusive right of selling said medicines within said limits, so far as I can assure such right to them, and free from any competition

or interference by me or any one claiming under me or acting by or with my authority, permission, or aid, either directly or indirectly;" and he further covenanted that he "will not, and my heirs, executors, administrators, and assigns shall not, either within said territory westerly of the ridge of the Rocky Mountains, or within said British Columbia or Mexico, hereafter make, put up, sell, or offer or expose for sale, any of said Wistar's Balsam of Wild Cherry, or any other medicine whatever bearing the name of 'Wild Cherry,' in whole or in part, nor the said medicine under a different name prepared substantially from the same recipe or formula, or use the same, or trade-marks, or any of them, or be concerned, directly or indirectly, in the business of selling or in promoting the sale of said medicine within said limits in competition with said Fowles, their representatives and assigns, or in any way or by any means whatsoever do or knowingly aid or abet any other person to do anything to prejudice or interfere with the business of selling said medicine within the limits aforesaid solely by said Fowles, their representatives and assigns;" and then follows a covenant of further assurance.

If the defendants violated the provisions of these contracts by selling this article within the territory which it was covenanted complainants should occupy exclusively, or by selling to others for sale there, or by promoting such sales, we are aware of no reason for the refusal of relief unless it may be, as is contended, that the contracts were not enforceable on the ground of public policy.

We have not been favored with any opinion of the learned judge who decided the case in the Circuit Court, nor with any brief in appellees' behalf; and while we may naturally assume that the finding was based upon the supposed want of proof of violation of the contracts or their supposed invalidity, or both, we are left to conjecture as to the precise views which were entertained.

As we remarked in *Gibbs* v. *Consolidated Gas Company*, 130 U. S. 396, 409 : "The decision in *Mitchel* v. *Reynolds*, 1 P. Wms. 181; *S. C.* Smith's Leading Cases, Vol. 1, Pt. II., 508, is the foundation of the rule in relation to the invalidity

of contracts in restraint of trade; but as it was made under a condition of things and a state of society different from those which now prevail, the rule laid down is not regarded as inflexible, and has been considerably modified. Public welfare is first considered, and if it be not involved, and the restraint upon one party is not greater than protection to the other requires, the contract may be sustained. The question is whether, under the particular circumstances of the case, and the nature of the particular contract involved in it, the contract is, or is not, unreasonable. *Rousillon* v. *Rousillon*, 14 Ch. D. 351; *Leather Cloth Co.* v. *Lorsont*, L. R. 9 Eq. 345; *Oregon Steam Navigation Co.* v. *Winsor*, 20 Wall. 64, 68."

Relating as these contracts did to a compound involving a secret in its preparation; based as they were upon a valuable consideration, and limited as to the space within which, though unlimited as to the time for which, the restraint was to operate, we are unable to perceive how they could be regarded as so unreasonable as to justify the court in declining to enforce them.

The vendors were entitled to sell to the best advantage, and in so doing to exercise the right to preclude themselves from entering into competition with those who purchased, and to prevent competition between purchasers; and the purchasers were entitled to such protection as was reasonably necessary for their benefit. Williams had and transferred property in the secret process of manufacturing the article he had discovered, and he and his grantees could claim relief as against breaches of trust in respect to it. The policy of the law is to encourage useful discoveries by securing their fruits to those who make them. If the public found the balsam efficacious, they were interested in not being deprived of its use, but by whom it was sold was unimportant.

The decree below was probably not rendered, and cannot be sustained, upon the theory that these contracts were in themselves invalid.

It remains to be considered whether there is evidence tending to show that the defendants sold the balsam within the prohibited territory, or to those by whom to their knowledge it was to be there sold, or in any way promoted such sale.

We are of opinion that the record discloses violations of the contracts in these particulars, and that the cause should have gone to a master to state an account. One of the defendants was called by complainants as a witness, and though apparently an unwilling one, he admits four shipments of balsam to Atlanta, Ga., in 1879, 1880, 1883 and 1884; a shipment, in 1879, to New York; a shipment, in April, 1880, to Philadelphia; and identifies an entry on defendants' sales-book of a shipment to Coffin, Reddington & Co., San Francisco, Cal., in 1878, charged to Smith & Co., of Dayton, Ohio; although Georgia, New York, Philadelphia and California were all within complainants' territory. Evidence was also adduced of shipments by defendants to Henry, Curran & Co. at New York, in 1874, 1875 and 1876, not for sale in defendants' territory, but for the general purposes of the Eastern trade, and sold within the territory embraced in the original transfer to Butts, and of sales directly by Park & Sons to Crittenden and McKesson & Robbins, of New York, in 1878, 1880, 1881 and 1882. Coffin, of Coffin, Reddington & Co. of New York and San Francisco, testifies that for seven years he had purchased Park's Wistar's Balsam from S. N. Smith & Co., Dayton, Ohio, commencing in 1877, and the last purchase being in 1883, and that purchases were made under orders to ship direct to California, and that Smith & Co. furnished it for seven dollars a dozen, less freight. Smith testifies to the shipment of nine gross of this balsam to California, to the San Francisco branch of Coffin, Reddington & Co., during the years 1879 to 1883, inclusive, and one gross to John Helm & Co., of California; that he did not usually keep the article in stock, but ordered it from Park & Sons, and sometimes had the goods shipped directly by them; that while they rendered bills charging $84 and $87 per gross in some instances, or seven dollars or more per dozen, he, in fact, paid them only what he received, seven dollars per dozen less the freight, which, of course, indicates that defendants knew where the balsam was going, since they not only shipped some direct, but were paid by Smith on the basis of deducting freight equivalent to the charges to California, and, as well put by appellants' counsel, "if the sales

were to Smith & Co., in fact, then they were for much less than seven dollars a dozen, and in violation of contract." Smith also testifies to two instances—one in 1877 and one in 1878—of the shipment of ten gross and five gross to Coffin, Reddington & Co., California, for so much less than seven dollars per dozen as the amount of the freight to California, which balsam Smith & Co. procured from the defendants, paying them the net sum received. The witness Park did not deny that balsam had been shipped directly to California, upon the order of Smith & Co.; he testified that they kept the balsam in stock at one time with Smith & Co., to be sold on their account; he would not say that the entries on the sales-books in the name of Smith & Co. necessarily showed to whom the article was shipped, and said that he did not know whether, when charged to Smith & Co., the article was shipped to them or to other parties; he identified the entry of one shipment to Coffin, Reddington & Co.; he knew the average amount of freight per gross on balsam shipped to California, which, deducted from $84, the contract sales price per gross, left substantially the amount in all cases received by Smith & Co. on the California shipments, and by them paid to Park & Sons; and he admitted several charges on Park & Sons' books against Smith & Co., for merchandise, corresponding in dates and amounts with shipments to California. The inference is a reasonable one, that the defendants knew that the balsam claimed to have been sold to Smith & Co., and which was shipped to California, was going there, and in addition they had been informed, in 1878, by the complainants, of the report that Wistar's Balsam of defendants' make had made its appearance in the San Francisco market, and complainants had subsequently objected to sales within their territory, to which defendants paid no attention. We do not think the latter are in any position to say that they did not know what was going on. Neither of them was called for the defence nor any testimony taken on their behalf. We are satisfied complainants sufficiently made out their case to justify according to them the relief prayed.

*The decree is reversed, and the cause remanded for further proceedings in conformity with this opinion.*