Putnam, Circuit Judge.
Plaintiffs concede that the second count is invalid. The important and difficult questions in the case turn on the first count, and the contract which is made a part of it by its tenor. We desire at the outset to dispose of two or three minor considerations. It is clear that the point of nonjoinder of other parties is not well taken, because it is plain that each subscriber to the contract is holden only for his own payment. Also, on the matter of ultra vires, inasmuch as a corporation instituted for private trading or manufacturing purposes, and owing no special duty to the public, can ordinarily limit or entirely *565 omit the exercise of its corporate powers, and is no more holden than an individual to proceed at a pecuniary loss with its intended operations, no question of that sort can be raised on a declaration alleging unqualifiedly that a contract was made. In a declaration of this character, all questions of ultra vires, authority of officers of the corporation, and formalities of execution are covered in; and objections in reference thereto can only be made to appear by subsequent pleadings, or by the facts as developed at the trial. The proposition of the plaintiffs that, as they had fully performed, the defendant is liable, even if the contract could not be enforced while it was executory on both parts, is not sufficiently sustained by the authorities cited by them, and is controverted by Bishop v. Palmer, 146 Mass.469,16 N. E. Rep. 299; Arnot v. Coal Co., 68 N. Y. 558; Gibbs v. Gas Co., 130 U. S. 396, 9 Sup. Ct. Rep. 553; and Central Transp. Co. v. Pullman’s Palace Car Co., 139 U. S. 24, 11 Sup. Ct. Rep. 478. Also, the plaintiffs’ proposition that what is sought to be accomplished by this contract indirectly might have been, under the law, accomplished directly, by the defendant’s purchasing the works and closing them, does not aid us in coming to a conclusion in this case. There are many matters which the law cannot prevent, but which it refuses to aid when in an executory form. This is singularly illustrated by many of the expressions in the house of lords in Steamship Co. v. McGregor, [1892] App. Cas. 25. Also the decisions quite uniformly recognize the distinction, in actions for the price of manufacturing plants sold, between cases where the vendor merely has knowledge of the purpose of the purchaser to create a monopoly, and those where the vendor becomes an active participant in that purpose. If we were to accept the law without modification, as one branch of it was left by the court of king’s bench in Mitchel v. Reynolds, 1 P. Wms. 181, (A. D. 1711,) and as the other was stated in 4 Bl. Comm. pp. 156-159, concerning forestalling and engrossing, there would seem to be no doubt that the demurrer would necessarily be sustained. So far as the latter branch is concerned, the contract would seem to be in violation of the old rules of the common law, intended to prevent the gathering up of the control of commodities into few hands; and, as to the former, while Mitchel v. Reynolds, was that of an individual excluding himself from pursuing his occupation, yet there can be no difference in principle or practical application between shutting out a person and shutting out a manufacturing plant or establishment. Indeed, the latter would much more probably tend to the detriment of public and private interests than the former, and on a much larger scale. In such instances, not only does an individual operative suffer the personal injury against which Mitchel v. Reynolds, was aimed, but the public receives detriment through a destruction of values and a depopulation extending through entire towns or villages. We must, however, take cognizance of the fact that the rules formerly laid down touching this topic are not now to be regarded as inflexible, and have been considerably modified. Gibbs v. Gas Co., ubi swpra, 409, and Fowle v. Park, 131 U. S. 88, 97, 9 Sup. Ct. Rep. 658. This has, perhaps, been the result of the pressure of the tremendous advances made by the *566 vast extensions and rapidly increasing complications of modern business and manufacturing affairs, and of an apparent inability of perceiving how the old, strict rules can be applied judicially to the present conditions without laying down propositions which might in their application check enterprise, or interfere with freedom of trade. The departure in this direction by the judiciary and by legislation have been even more marked in Great Britain than in the United States. This will be seen, so far as the courts are concerned, from striking expressions in some of the English cases which we will cite, especially by the result in Collins v. Locke, L. R. 4 App. Cas. 674, and by many things said in Steamship Co. v. McGregor, supra, in the house of lords, by Lord Coleridge, (21 Q. B. Div. 544,) and in the court of appeal, (23 Q. B. Div. 598.) While in the United States there is a tendency to revive, with the aid of legislation, the strict rules of the common law against all forms of monopoly or engrossing, the legislation of Great Britain has had a different tendency. In Steamship Co. v. McGregor, 23 Q. B. Div. 628, 629, Lord Justice Fry said:
“The ancient common law of this country and the statutes with reference to the acts known as badgering, forestalling, regrating, and engrossing indicated the mind of the legislature and of the judges that certain large operations in goods which interfered with the more ordinary course of trade were injurious to the public. They were held criminal accordingly. But early in the reign of George III. the mind of the legislature showed symptoms of change in this matter, and the penal statutes were repealed, (12 Geo. IÍI. c. 71,) and the common law was left to its unaided operation. This repealing statute contains in the preamble the statement that it had been found by experience that the restraint laid by several statutes upon the dealing in corn, meal, flour, cattle, and sundry other sorts of victuals, by preventing a free trade in the said commodities, had a tendency to discourage the growth and to enhance the price of the same. This statement is very noteworthy. It contains a confession of failure in the past; the indication of a new policy for the future. The new policy has been more clearly declared and acted upon in the present.reign; for the legislature has, by 7 & 8 Viet. c. 24, altered the common law by utterly abolishing the several offenses of badgering, engrossing, forestalling, and regrating. ”
Therefore, in view of the modern English tendency, encouraged in the legislation explained by Lord Justice Fry, it may not be safe to follow the later English decisions too closely, although some of their most extreme expressions are found in the cases cited by the supreme court in Gibbs v. Gas Co., 130 U. S. 396, 9 Sup. Ct. Rep. 553. We do not intend, however, to launch into a boundless sea of trouble by attempting a general investigation of the present condition of this branch of the law in the United States and Great Britain. We have referred to it only to show the necessity of making an examination sufficient to ascertain whether there are any modifications of the old rules which reach the case at bar. We think it will be found that the later decisions divide themselves into three or four classes, none of which affect it. One embraces such cases as Collins v. Locke, ubi supra, and Machinery Co. v. Dolph, 138 U. S. 617,11 Sup. Ct. Rep. 412, and 28 Fed. Rep. 553. This consists, not in agreements that establishments shall be closed, or that any one shall withdraw from *567 his trade or profession, although such results may incidentally follow, but in agreements for apportionments between individuals or corporations; and these are quite likely to be in the line of the modern division of labor, and thus prove of advantage to the community. Another .class relates to new enterprises, for the building up of which parties are not likely to Aventure, unless permitted to impose their own conditions. This class is illustrated in part by Fawle v. Park, 131 U. S. 88, 9 Sup. Ct. Rep. 658; and Cloth Co. v. Lorsont, L. R. 9 Eq. 345. Another relates to conditions on which persons enter the employment of manufacturers or dealers, and is illustrated by Rousillon v. Rousillon, 14 Ch. Div. 351. Still another class, and perhaps the most striking of all, is that which enlarges the limitation of the territory within which, for proper reasons, an individual may bar himself from pursuing his trade or profession. The courts now seem to consider that Mitchel v. Reynolds referred to a trade which was necessarily local, at a period when all trades were presumably of that character; and that is therefore not strictly applicable to the present condition of affairs, when the good will which a manufacturer or dealer secures is often national or international in its character, requiring for its protection agreements likewise national or international in their effect. The principle of this class is recognized in Rousillon v. Rousillon, ubi supra, and in Navigation Co. v. Winsor 20 Wall. 64.
We think it will be difficult to find any departure or modification of the old rules not covered by the foregoing classification, no part of which seems to touch the case at bar. This relates solely to the question whether a contract is against public policy, in which, for a merely pecuniary consideration, a manufacturer agrees to close his works entirely, or in part, for a specified number of years; in the case at bar made all the more characteristic in consequence of the counter stipulation that, if either of the other parties to the agreement should extend his works, the contract should become void. The defendant maintains that there is a lack of legal consideration for his promise. We presume he does not mean by this that a contract which may in some senses operate in restraint of trade, is invalid simply because the only consideration which the promisor receives is a pecuniary one. In Navigation Co. v. Winsor, ubi supra, this was the only consideration; yet the court sustained the contract, observing that the stipulation objected to “was presumed to be founded on a valuable consideration in its influence on the price paid for the steamer.” The cases are full of observations to the effect that the courts maintain these contracts under reasonable circumstances, principally because it is through them only that parties who have built up by honest industry a trade with a valuable good Avill, can secure an equivalent for the latter. The suggestion of the defendant on this point, however, leads directly to a proposition which seems to open a path through this case.
It will be observed that, although the suggestion of the defendant that a mere pecuniary consideration is not sufficient to sustain these contracts cannot be taken without qualification, yet this class of agreements is so different from ordinary ones that no action can be maintained on one of *568 them, because it is under seal, without some reasonable consideration is shown. What is this reasonable consideration? Ordinarily, it is that when the covenanter surrenders his trade or profession an equivalent is given to the public; because, ordinarily, as a part of the transaction, the covenantee assumes and carries on the trade or profession, nothing is abandoned, and only a transfer is accomplished. The same occupation continues; the same number of mouths are fed. So, in the later cases, modifying Mitchel v. Reynolds with reference to the territory within which agreements to withdraw from a trade or profession may lawfully he effective, as the fact is that the field through which the transfer of the business operates is frequently national or international, instead of local. So, also, in the class of cases already spoken of, in which there is only a division of labor. This doctrine of compensation, by force of which the public and individuals lose nothing, was recognized in Navigation Co. v. Winsor, ubi supra, in a striking way.. The original contract under discussion in that case-related to a period of seven years. As to this, the court said (page 71) that “the public was not injured by being deprived of any-of the business enterprise of the country.” A subsequent contract was made, which was the one then before the court, by which, without any compensation to the public, a new contract Covering ten years was made for a merely pecuniary cofisideration, and the court held it void for the additional three years. In this case the court used (page 69) the following expressions:
“This stipulation was necessary to protect the former company from interference with its own business. It had no tendency to destroy the usefulness of the steamer, and did not deprive the country of any industrial agency. The transaction merely transferred the steamer from the employment of one company to that of another, situated and doing business in another state. It, involved no transfer of residence or allegiance on the part of the vendee in order to pursue its employment, nor any cessation or diminution of its business whatever. The presumption is that the arrangement was mutually beneficial to both companies, and that it promoted the general interests of commerce on the Pacific coast.”
To a like effect is Central Transp. Co. v. Pullman’s Palace Car Co., 139 U. S. 24, 53, 54, 11 Sup. Ct. Rep. 478.
Navigation Co. v. Winsor laid down very satisfactorily the reasons supporting this branch of the law, stating that one is the injury to the public by being deprived of the restricted party’s industry, and the other the injury to the party himself by being precluded from pursuing his occupation, and being thus prevented from supporting himself and his family. It seems to the court that the case at bar is subject to both of the objections stated, without any proper compensatory consideration. The court also thinks that, in lieu of having “no tendency to destroy the usefulness” of property, or “to deprive the country of any industrial agency,” or to require “transfers of residence or allegiance,” or “the cessation or diminution of business,” it is in all these respects directly the reverse.
Some of the decisions observe that contracts are presumably invalid *569 which prevent a manufacturer from operating his works for a considerable period of time as he may deem his own interests or those of the public require; and the court finds nowhere any modification of the old rules which relieves the case at bar from this objectionable feature. It is not intended by this to say, whether or not, in an emergency of an overstock, manufacturers or miners may stipulate for handling their works or mines in a specific manner, or for shutting them down in whole or in part, each for such limited time as would ordinarily enable a congested market to relieve itself; but a contract extending over a period of five years, intended, like this at bar, for restricting production, and absolutely binding manufacturers and dealers, while still retaining their plants and establishments, to operate them in a particular way, or to shut them down in whole or in part, is such an incumbrance on the freedom of individual action, necessary to the public good, as to be invalid. Therefore, in view of the fact that by this contract plaintiffs stipulate to shut down their works, at least so far as strap and T hinges are concerned, for the long period of five years, for no consideration except a pecuniary one, and without a lawful equivalent with reference to the continuance of manufacturing, or its development, in other directions, and also in view of the other fact, that this contract is especially marked by the further stipulation that it shall be void if the other parties to it increase their existing facilities, the court holds that, as the case stands, the demurrer must be sustained as to both counts. The expression of the supreme court in Gibbs v. Gas Co., 130 U. S. 396, 409, 9 Sup. Ct. Rep. 553, repeated in Fowle v. Park, 131 U. S. 88, 9 Sup. Ct. Rep. 658, that “the question is whether, under the particular circumstances of the case and the nature of the particular contract involved in it, the contract is or is not unreasonable,” must, however, be regarded. The court will not presume to define, in advance of the facts which may be shown, or perhaps to define at all, what may be the practical effect of these expressions; but, being warned by them, it cannot determine on this demurrer that it is impossible for the plaintiffs to allege particular circumstances, not now appearing, which may modify the result. It is equitable as between the parties that the plaintiffs should recover the money stipulated for by the contract; therefore an opportunity should be given to amend, if desired.
Demurrer sustained. The first and second counts and the declaration are adjudged insufficient. Judgment for defendant, with costs, unless on or before November rules next plaintiffs amend, and pay costs to the time of filing their amendment.