UNITED STATES CHEMICAL CO. v. PROVIDENT CHEMICAL CO.

(Circuit Court, E. D. Missouri, E. D. December 17, 1894.)

No. 3,759.

CONTRACTS IN RESTRAINT OF TRADE—MONOPOLIES—PUBLIC POLICY.

The U. Co., which was engaged in the manufacture of bone tartar, leased its building and equipment, used in such manufacture, to W. for 10 years, at $12,000 per year. The actual rental value of the land and building was between $2,000 and $2,500 per year, but the profits derived by the U. Co. from the business conducted on the premises with the leased equipment were from $10,000 to $12,000 per year. The lease contained a covenant that, during its continuance, the U. Co. would not engage in the manufacture of bone tartar, and other provisions which, it was claimed, showed that the intention was not to operate, but to close, the leased factory. On the day the lease was made, it was assigned, with the consent of the U. Co., to the P. Co., which was engaged in the same business, and had for many years been the chief producer of bone tartar. It appeared that the lease had been made with the intention that it should be assigned to the P. Co., and that it was made for the purpose of removing the U. Co.'s competition from the market. Other competitors afterwards sprung up. The price of bone tartar declined. The P. Co. ceased to pay the agreed rent, and, being sued, set up in defense that the lease was void, as being in restraint of trade, and tending to create a monopoly. *Held*, that as the contract conferred no special or exclusive privilege, but left the trade open to the competition of any other parties, it had no tendency to create a monopoly; that it was no more than a lawful exercise of the power to contract for the protection of the business of the P. Co., and was not against public policy, nor void.

This was an action by the United States Chemical Company against the Provident Chemical Company for rent, on a lease. Trial by the court, without a jury.

Action for rent. Defense that the lease is void, because antagonistic to public policy. On the 25th of September, 1888, the plaintiff company leased to Henry H. Welch, for the term of 10 years, from the 1st of September of that year, at a monthly rental of $1,000 per month, in advance, the building and equipment then used by it for the manufacture of bone tartar in Camden, N. J. The mutual covenants are expressed in seven paragraphs. The first stipulates for the right of entry for default in the payment of rent, and is of the usual character. The second prohibits the assignment of the leasehold or an underletting without the written consent of the lessor.

The third provides that, if the premises be destroyed by fire, the lessor shall have 20 days within which to elect to rebuild, and, if the lessor shall choose to rebuild, the rental should then continue for a period of three months, and not longer, until after the complete restoration of the rebuilding, when it would again revive. If the lessor elected not to rebuild, such determination concluded the term. The fourth is a covenant that in the event the buildings should be destroyed by fire, and the lessor elect not to rebuild, then the lessor will not engage in the manufacture of bone tartar so long as the lessee shall continue to pay the rental of $1,000. The fifth assures to the lessee the right to remove any engine, boilers, tools, machinery, or fixtures placed upon the premises. The sixth relates to the prudent use of the premises, so as not to increase the risk by fire, and restricts the employment of the premises to the manufacture of bone tartar. The seventh and concluding covenant is as follows: "Said lessor, for itself, its successors and assigns, hereby covenants to and with said lessee, his heirs, executors, administrators, and assigns, that it, said lessor, will not, during the period that this lease may be in force, and that the rent herein reserved shall be paid as it falls due, ever manufacture or sell any bone tartar." On the day the lease was executed, it was, with the consent of the lessor, assigned to the defendant, a corporation organized pursuant to the laws of Missouri, and which, for many years antecedent, had been engaged in the manufacture of bone tartar at the city of St. Louis, and whose trade in that product extended throughout the United States, wheresoever there was a demand for that article. Although the lease was made to Mr. Welch, it was understood by both parties that he was merely the representative of the defendant company, whose officers had negotiated and consummated the terms of the trade. The plaintiff was organized as a corporation under the laws of New Jersey, and had for a number of years been engaged in manufacturing various kinds of chemical compounds, principally sulphuric acid, alum, rock tartar, fertilizers, and latterly bone tartar, at Camden, N. J. It used a separate building for each of the different kinds of its products, and each was operated by mechanical power derived from a common motor. The building which the defendant leased had no power, and unless supplied with engine, as seems to have been contemplated by paragraph 5 of the lease, or power rented from the defendant, would be useless for the manufacturing purpose for which it had been rented. The defendant points to this incident as a clear indication of a design, of which both parties must be cognizant, not to employ the building in the business to which it was especially adapted, but to close it up, so that the defendant would be in complete control of the trade in bone tartar. And there is some evidence that, in conversations attending the negotiations which culminated in the lease, the defendant expressed an intention not to operate the factory; and also that, at least for the immediate future, if the negotiations were concluded, the defendant would have complete control of the trade in the bone tartar commodity; and that this latter feature was utilized by the plaintiff to obtain the rental finally agreed upon.

"Bone tartar" is a coined term for the chemical compound "acid phosphate of calcium," and is obtained by treating calcined bone or fossil and kindred rock with sulphuric acid. Whether made of bone or fossil rock is not discernible in the finished product, either by taste, analysis, or effect in use. Bone and rock tartar are indiscriminately used as one of the prime components of baking powder. It was the trade of the manufacturers of baking powder that the defendant had been cultivating for years, and of which, so far as bone tartar, its exclusive product, was used, it had almost the exclusive patronage up to the time when the plaintiff began to produce bone tartar. The plaintiff's first manufacture of acid phosphate of calcium was from rock, but, for two or three years before the date of the lease, it had added to its works, at Camden, the building leased to the defendant, especially adapted to the making of bone tartar, and early began to press this product upon the market, in competition with that of the defendant, and threatening to become a dangerous rival. The defendant, in order to protect its trade, conceived the idea of perpetuating its regency in this particular field by gaining control of the plaintiff's works whereat

the rival product was made. Its efforts resulted in the lease which is the basis of this suit. The quality of the plaintiff's bone tartar was equal to that of the defendant's. While the manufacture of acid phosphate of calcium was·open to the talent and capital of any one, yet, to successfully make it, great skill and experience were required, and this skill had only been attained by. the plaintiff and defendant, with a few unimportant exceptions, up to the time of the lease. A Mr. McNab was the expert in charge of the plaintiff's works, and, after the execution of the lease, the defendant requested the plaintiff to endeavor to keep him in its employment in the other departments of its business, so that he might not engage in starting a business that would compete with the defendant's; and this the plaintiff, in a spirit of accommodation, consented, so far as it could with propriety, to do. The defendant, after the lease was made, purchased of the plaintiff all of its finished products, both of rock and bone tartar, and the raw material for making them. The raw material was sent to the defendant's works at St. Louis, and the manufactured sold from Camden to customers, including those who had been purchasers of the plaintiff, and to whom the plaintiff used its best endeavors to introduce defendant, under the name of the United States Tartar Company, the defendant thinking it prudent to disguise the fact that it had acquired the plaintiff's factory and bone tartar business. The value of the leased premises is shown to be between $17,000 and $24,000 and the annual rental to be from 10•to 15 per cent. of this value, while the rental stipulated in the lease is $12,000 per annum. Inasmuch as the lease contains no grant of the good will of the plaintiff, the defendant contends this large monthly sum is but the price which the plaintiff demanded for withdrawing its rivalry to the defendant; while, upon the other hand, the plaintiff contends that it is but a fair compensation for the profit it had been realizing and might reasonably anticipate from that particular branch of its business, and the use of the leased property; and I am convinced of the accuracy of the plaintiff's contention by the evidence. Up to May, 1893, the rental was promptly paid by the defendant. McNab, without the connivance of the plaintiff, had left its employment, and had started a factory for making bone tartar. Other rival institutions sprang up, and the prices of bone tartar were tending downward; and under these influences the defendant repudiated the lease, as contrary to the policy of the law. The plaintiff sues for the rent in arrear.

John C. Orrick, for plaintiff.

Harmon, Colston, Goldsmith & Hoadley and A. Moore Berry, for defendant.

PRIEST, District Judge (after stating the facts). The question of moment in this case is whether the seventh covenant of the lessor, not to manufacture or sell any bone tartar during the period the lease may be in force, is in restraint of trade, and for that reason void. The transaction in which this restriction appears is the leasing of premises and equipment especially devoted to the manufacture of bone tartar. The rental value of the real estate and buildings was between $2,000 and $2,500. The profits derived by the plaintiff from making and sale of bone tartar were from $10,000 to $12,000 per annum at the time the lease was made. It is manifest that the inducement moving the plaintiff to lease the premises was to obtain a fixed and certain sum, rather than a contingent and uncertain one; and the motive of the defendant was to get rid of a dangerous and aggressive competitor in the trade of the article of which it was in practical control, and to the manufacture of which it was exclusively devoted. The plaintiff sought a trade for this article throughout the United States,—an achievement which the

defendant had already accomplished, being earlier in the field. In view of these conditions, is the covenant condemned by public policy?

The restraint extends literally everywhere, but a fair construction would limit it to the United States. If valid to that extent, we have no concern with the broader boundary. It is commonly and casually said that contracts in general restraint of trade are void. This rule, whatever may have been its earlier character, is now neither arbitrary nor inflexible. The sense of the modern decisions is that, if the restraint is only commensurate with the fair protection of the business sold, the contract is reasonable, valid, and enforceable. It is only where the restriction can be of no avail to the vendee, and unnecessarily hampers the vendor, that it becomes oppressive and void. Fowle v. Park, 131 U. S. 88, 9 Sup. Ct. 658; Ellerman v. Stock-Yards Co. (N. J. Ch.) 23 Atl. 287; Long v. Towl, 42 Mo. 545; Match Co. v. Roeber, 106 N. Y. 473, 13 N. E. 419; Lawson, Cont. § 327.

Among the potent reasons first assigned against such contracts was that the person restrained by thus surrendering his chosen occupation—one for which he had been especially prepared—might become a public charge, and the public be injured in being deprived of his personal skill in the avocation to which he had been brought up. Such reasons cannot be applied to artificial persons without absurdity. The substantial ground in all cases, especially where corporations are concerned, is that such contracts tend to create monopolies. In discussing this phase of the subject, we must not lose sight of some other principles, the disregard of which would be more harmful to public interest than monopolies. The right to contract is a cardinal element of constitutional liberty, and, as such, should be jealously guarded. In one of the cases supra it is said:

"It is clear that public policy and the interest of society favor the utmost freedom of contract within the law, and require that business transactions should not be trammeled by unnecessary restrictions. 'If,' said Sir George Jessell, in Printing Co. v. Sampson, L. R. 19 Eq. 462, 'there is one thing more than any other which public policy requires, it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that contracts, when entered into freely and voluntarily, shall be held good, and shall be enforced by courts of justice.'" Match Co. v. Roeber (N. Y. App.) 13 N. E. 422.

Private corporations are subject to the control of the states from which they derive their charters. From an abuse or misuse or excess of their powers, they can be called to an account by the state. It is better such control and regulation should be had by that ample authority than, indirectly, by a foreign forum, upon collateral questions of public expediency. The facts of this case disclose no tendency to monopoly. Monopoly implies an exclusive right, from which all others are debarred, and to which they are subservient. Greene's Case, 52 Fed. 104. In Match Co. v. Roeber, supra (a case very similar in facts to this), the court observed:

"To the extent that the control prevents the vendor from carrying on the particular trade, it deprives the community of any benefit it might derive from his entering into competition. But the business is open to all others, and there is little danger that the public will suffer harm from

lack of persons to engage in a profitable industry. Such contracts do not create monopolies. They confer no special or exclusive privilege."

That the contract in this case was ineffectual to create a monopoly, or even to confer a dominating control over the trade in bone tartar, is confessed to some extent by the answer, wherein it assumes, as a just reason for repudiating the contract, competition subsequently started. Acid phosphate of calcium is made by several processes. The plaintiff employed two,—one from rock, and the other from bone. It leased the plant for making bone tartar only, reserving the other. The process was not discernible in the finished product. There is nothing in the contract from which we can reasonably infer a tendency to create a monopoly such as the law condemns. Even if an article be of prime necessity, the public is not concerned with who makes, but only with the reasonableness of, the price. But it is said that the defendant had, by its part in the transaction, such a purpose in view. This may be. The intent is only condemned as it is manifested in an unlawful act. If a person does a lawful act with a vicious intent, he is without the pale of legal punishment. Whatever may have been the defendant's motive, and even if reprehensible, there is no rule by which we may reprimand the plaintiff for the defendant's evil or wrongful intentions or acts. Whether the defendant's purpose is condemned by law or not does not affect the validity of the contract, unless plaintiff contributed something more to the accomplishment of the unlawful design than the mere leasing of its property. Labbe v. Corbett, 69 Tex. 503, 6 S. W. 808; Tied. Sales, § 294. But we are of the opinion that defendant has been hastily and unnecessarily self-accusing. The plaintiff was making inroads upon the defendant's business, and greatly cutting the prices of its sole manufactured product, while with the plaintiff this product was but a single feature of its manufacturing plant. The defendant had a perfect right to buy off the competition of a dangerous, powerful, and aggressive rival. The law of self-defense and protection applies to one's business, as well as to his person. But, if another springs up in the stead of the one silenced, the courts cannot, under the guise of public expedience, relieve him from the improvidence of his first contract.

Our attention has been called to many cases which condemn, in perhaps not too severe terms, combinations and trusts. It is a nervous and alarmed imagination which sees in every transaction involving large exchange of properties a monster threatening public interests. Combinations in the nature of modern trusts, so soundly condemned, are those which aim at a union of energy, capital, and interest to stifle competition, and enhance the price of articles of prime necessity and staples of commerce. In such cases there is absent the element of exchange of one valuable right or thing for another. In the contract here we find none of the elements of a combination or trust. It is a simple lease and sale for a fair and reasonable compensation, with stipulations only commensurate with a reasonable, necessary protection. The effect of the transaction, while not so literally expressed, was to convey with the premises the good will of the plaintiff in its bone tartar product and trade.

It is both unnecessary and unprofitable to discuss the many cases cited in the briefs. Upon a topic of public expedience, adjudications are, seemingly, necessarily inharmonious.

Judgment for the plaintiff for the rent sued for, and 6 per cent. interest upon each installment from the date it became due.