### KNAPP v. S. JARVIS ADAMS CO.

(Circuit Court of Appeals, Sixth Circuit. February 13, 1905.)

No. 1,362.

**1. EQUITY—RIGHT TO MAINTAIN SUIT—COMING INTO COURT WITH CLEAN HANDS.**

The maxim of equity that a complainant must come into court with clean hands has reference to fraud or misconduct on the part of complainant in regard to the transaction which is the subject of controversy, and the fact that there was fraud or illegality in the organization of a corporation cannot be set up to defeat its right to maintain a suit for the enforcement of a contract made by it, and of which the defendant received and retains the benefit.

[Ed. Note.—For cases in point, see vol. 19, Cent. Dig. Equity, § 186.]

**2. CORPORATIONS—POWERS OF DIRECTORS—DECLARING DIVIDENDS.**

The directors of a corporation are impliedly vested with a discretionary power with regard to the time and manner of distributing its profits, and, in the absence of fraud or an abuse of discretion, their action in leaving profits earned in the business instead of distributing them to the stockholders in dividends is legal, and constitutes no violation of the rights of a stockholder.

[Ed. Note.—For cases in point, see vol. 12, Cent. Dig. Corporations, §§ 1288, 1289.]

**3. CONTRACT IN RESTRAINT OF TRADE—CONSIDERATION—LEGALITY.**

Defendant entered the employment of complainant corporation under a contract by which, in addition to his salary, certain stock of the corporation was to be held for his benefit, and the profits or dividends ap-

plicable thereto were to be credited to him toward the purchase price. The contract provided that should he leave the employment for the purpose of entering into a competing business his right to the stock should be forfeited, and he should be entitled only to such sum as had been actually credited to his stock account, but that should he be discharged or leave for any other purpose he should receive the book value of the stock, less the amount due thereon. The company earned a profit the first year, but the same was used in its business, and no dividend was declared and no credit passed to defendant on his stock. Shortly thereafter he left the employment. *Held*, that the payment to him by the company of the book value of the stock, less the purchase price, the amount paid being about 25 per cent. of the face value, constituted a good consideration for a contract by him not to enter into or assist in any competing business for a term of 10 years, and that such contract was legal and enforceable, being ancillary to and in accordance with the original contract of employment.

**4. SAME—TERRITORIAL RESTRICTION.**

A contract not to enter into business in competition with a complainant for a term of years, based on a good consideration, may lawfully extend to all territory wherein complainant's trade is likely to go, having regard to the nature of the business.

[Ed. Note.—For cases in point, see vol. 11, Cent. Dig. Contracts, §§ 554–569.]

Appeals from the Circuit Court of the United States for the Southern District of Ohio.

Bargar & Bargar and Pomerene & Pomerene, for appellant.

Henderson & Livesay, for appellee.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

SEVERENS, Circuit Judge. This case was brought here on a former occasion on an appeal by the S. Jarvis Adams Company from a decree dismissing its bill of complaint upon demurrer. The decree of the court below was reversed, with directions to permit the filing of an answer and for further proceedings. 121 Fed. 34, 58 C. C. A. 1.

Upon the entry of the decree in the Circuit Court, pursuant to our mandate, the defendant in that court, who is the appellant here, filed his answer. The answer admits the making of the contracts shown by Exhibits A and B, denies some other allegations of the bill, and sets up certain special matters of defense, which will presently be stated. These exhibits, A and B, were attached to the bill when the latter was filed. The substance of the case as stated by the bill (and of the exhibits which were part thereof) is given, with our opinion, in the volume of reports and at the page of the foregoing citation, to which, in order to save needless repetition, we here refer.

The complainant filed a replication to the answer, proofs were taken, and the case brought to hearing. Judge Thompson, who presided in the Circuit Court, being of opinion that the case as presented by the proofs was controlled by our decision on the former appeal, directed a decree for the complainant.

Counsel for the appellant state the issues for decision by this court, as they understand them, to be as follows:

"First, whether the complainants come into a court of equity with clean hands; second, whether there are in fact any secret processes or trade secrets,

135 F.—64

to be protected; third, whether the contracts upon which the original complaints are founded are such contracts in restraint of trade as are valid, and (a) are founded upon a legal consideration; (b) afford but a reasonable protection to complainants; (c) require but a reasonable restriction of Knapp and Bossert; (d) are merely ancillary to the main purpose of a lawful contract."

The second of these questions may be dismissed. The decree is silent upon that subject, the complainant having apparently waived any relief in respect to its trade secrets or secret processes. The ground of controversy on that branch of the case is therefore removed.

The special matter of the first "issue" above stated is based upon certain evidence brought out upon the examination of witnesses and not upon any averments of the answer. The imputation that the complainant does not come with clean hands rests upon this basis: that it is shown that when McKnight, Fownes, and the Speers, the parties of the first part in the contract Exhibit A, proceeded to organize the S. Jarvis Adams Company, they first bought out the plant of S. Jarvis Adams & Co. and its good will for $390,000, and after the company was incorporated they sold this property to it for $600,000, and took the company's entire capital stock, which was of the same amount, in payment, the company agreeing further to repay them $125,000, the down payment to S. Jarvis Adams on the purchase from him, and assume the payment of the remaining $265,000 to S. Jarvis Adams & Co., which had not yet been paid. It is thereupon said by counsel for appellant that the stock was all "pure water," which is not very wide of the mark, but not quite true. It represented the promoter's profits. The business of the company, however, was prosperous, and the profits of the first year amounted to $150,000.

But whatever the faults in launching the corporation may have been, they cannot be made the subject of inquiry and of remedy in the present suit. The state might interpose to correct them or annul the charter if the incorporation was fraudulent, or, perhaps, the stockholders, if any were defrauded, or creditors, might, in some circumstances, have a remedy in a direct proceeding for that purpose; so that, if we could bring ourselves to believe that the defendant did not know all these facts while he was associated with the company and a prospective stockholder, the matter would be foreign to the present controversy. The maxim of equity to which the defendant refers contemplates some fraud or misconduct on the part of complainant in regard to the transaction which is the subject of controversy, and not to matters not involved in it. It may further be observed that the defendant has never, on that account or any other, sought to rescind the agreement by which his controversy with the company was settled and which is the basis of the present suit. He got the $6,480.95, and keeps it.

It is manifest that the controversy between the appellant and the company was settled upon the faith of his agreement that he would not engage in competition with the company's manufacture and sale of the specialities enumerated in the contract. By reference to the original contract (Exhibit A), which was the basis of the controversy, it is seen that if he left the company to go into a competing business he was to receive only what had been credited to him upon his stock, which was nothing; whereas, if he left without that intention, he would re-

ceive the book value of his stock, less the sum due upon it, which would include the undivided profits. No dividend had ever been declared, and no credit on the purchase of his stock was due him. The power to declare dividends rests with the directors of a corporation, and a large discretion is given them whether to retain its surplus profits as part of the working capital or divide it out to the stockholders. To be sure, an abuse of that discretion which works a fraud upon the stockholders may be relieved against by a court of equity.

In 1 Mor. on Corp. 447, it is said:

"Profits earned by a corporation may be divided among its shareholders; but it is not a violation of the charter if they are allowed to accumulate and remain invested in the company's business. The managing agents of a corporation are impliedly invested with a discretionary power with regard to the time and manner of distributing its profits. They may apply profits in payment of floating or funded debts or in development of the company's business, and so long as they do not abuse their discretionary powers or violate the company's charter the courts cannot interfere."

And in Thompson's Article on Corporations, 10 Cyc. 548, the law is thus stated:

"In general, except where, under the governing statute or instrument, the directors are overruled by the shareholders, the propriety or expediency of declaring and paying dividends rests in their sound discretion, and the courts will not interfere to compel them to declare and pay a dividend unless they are guilty of bad faith, or of a willful abuse of this discretion, or, what is substantially the same thing, unless in refusing so to do they have acted unreasonably, capriciously, or fraudulently."

The stockholder has no title to the surplus earnings of the company until his share is segregated by the board of directors. The law upon this subject is well and clearly stated in Wheeler v. Northwestern Sleigh Co. (C. C.) 39 Fed. 347.

But here there is no proof of fraud in withholding dividends. The business of the company was growing and rapidly extending. It is quite possible that it was wise policy to retain the profits for use in the business. There was nothing in the original contract which entitled the stock set apart for Knapp to any special privilege not belonging to other stock, or that he was to be credited with undivided profits or dividends not declared, except that in one alternative upon his going out he would get an interest in the undivided profits in receiving the book value of the stock. And this confessedly he did get in the settlement. He says he gave this stipulation in the settlement upon advice and his own belief that it was not binding. But he knew that the other party relied upon it, and he is entitled to no relief against it by reason of any legal or equitable consideration due to himself. He must make defense, if at all, upon the ground that his stipulation was injurious to the public, and that the court will not help the other party.

In respect to the point made upon the third issue as grouped by counsel for the appellant, that the stipulation was not founded upon a legal consideration, we find nothing in the proof which disturbs our former conclusion that the consideration for his agreement was both legal and sufficient. It is further contended that the stipulation in question is not necessary to the reasonable protection of the complainant, and requires an unreasonable restriction of the defendant. The proof does not di-

minish the allegations of the bill which were admitted by the demurrer in respect to the scope of the complainant's business, and we are not required to revise our former opinion upon this subject. But we add some further observations. In Horner v. Graves, 7 Bingh. 735, Tindal, C. J., said in relation to this subject: "Unless the case was such that the restraint was plainly and obviously unnecessary, the court would not feel justified in interfering." U. S. v. Trans. Mo. Freight Ass'n, 58 Fed. 58, 78, 7 C. C. A. 15, 82, 24 L. R. A. 73, per Sanborn, J.; Phippen v. Stickney, 3 Metc. (Mass.) 384.

All such covenants do in some degree restrain trade. Whether the restraint is permissible by law depends upon the facts. The party who alleges that the restraint is such as to be in law obnoxious is bound to prove the facts which make it so. There can be no presumption, from the fact that there is some restraint in the instant case, that it is an unlawful one.

With respect to the territory to which the restriction should apply, the rule has always been that it might extend to the limits wherein the plaintiff's trade would be likely to go. The changes which have marked the course of judicial decisions in modern times seem to consist in conforming the application of the rule to the constant development of the facilities of commerce and the enlargement of the avenues of trade. In Harrison v. Glucose Sugar Refining Co., 53 C. C. A. 484, 116 Fed. 304, 58 L. R. A. 915, a valuable case upon this subject, and having many analogies to the present, Judge Jenkins refers to several cases of high authority in which there was no territorial restriction whatever. Among these is the case of Maxim Nordenfelt Guns, etc., Co. v. Nordenfelt (1894) App. Cas. 535, a highly important decision of the House of Lords which seems to have established the rule in Great Britain that the territorial restriction of such covenants must be such as the business of the covenantee requires, and is measured by such requirement, and that this is the test of reasonableness in that regard. And the Supreme Court of Michigan in 1873 held, in Hubbard v. Miller, 27 Mich. 15, 15 Am. Rep. 153, that when, as in that case, the covenant was unrestricted in terms in respect of place, it should be construed as not confined to the place where the covenantee had his store and traded, but as extending so far as to embrace the territory to which his trading might extend. So in Beal v. Chase, 31 Mich. 490, the same court held that where, on a sale of a publishing business, the vendor had agreed not to engage in a competing business anywhere in the state, the limits of the restriction were not open to valid objection. And see Fowle v. Park, 131 U. S. 88, 9 Sup. Ct. 658, 33 L. Ed. 67. We think it is not proved that the restriction which the defendant put upon himself was unreasonable or more extensive than the interests of the complainant might require. And so in regard to the subject-matter, it is fairly inferable that it was his skill in the manufacture of these few specialties to which the restriction relates that the appellant was employed. The restriction was not general.

Counsel for appellant lay stress upon the fact that his service under the contract of employment terminated with the month of October, and that the contract of settlement did not take place until November

12th. But the business relations of the parties continued and remained unsettled until the latter date. We do not perceive how the mere fact that the service had been discontinued at the former date affects the obligations of the agreement of November 12th.

The final issue stated involves the question whether the stipulation in question was ancillary to the main contract, or, more precisely stated, was ancillary to some other stipulation in the contract, the value of which to the promisee would be affected by the ancillary stipulation.

The contract of September 28, 1899, contained a stipulation that $25,000 of stock should be set apart to the appellant and become his property upon the conditions therein stated. The contract also gave to him, in one alternative, the right to share in the earnings of the company included in the book value of the stock, and only upon the payment thereof to him could he be compelled to reassign the stock or to relinquish it. He had an equitable title to the stock. When he resigned he insisted upon the alternative, which gave him rights of a stockholder, and in the settlement was paid the value of the stock. And he received the value of the stock, less, of course, the sum he agreed to pay for it, because he agreed to refrain from going into a competing business which would depreciate its value. It was the equivalent of a repurchase from a stockholder. As we said in our former opinion, the fact that he did not have the legal title, but only an equitable title, to the stock is not material. In the other alternative of going out to engage in a competing business, he would have been compelled to relinquish as from the beginning all the rights of a stockholder.

Another consideration is that in the contract of employment the company (for the contract became that of the company upon its adoption thereof after its incorporation) took security against the appellant's going into a competing business by the provision that in such event he should forfeit his claim to the profits of the company which had not been "actually credited" to him. In order to avoid this forfeiture he made the stipulation in question in the contract of settlement. The business and good will of S. Jarvis Adams & Co. were taken over with the plant by the corporation. No one will doubt that the restriction put upon the appellant as one of the terms of his employment was perfectly lawful; for the appellant had been the superintendent of S. Jarvis Adams & Co., and doubtless knew its customers. He was an associate with Bossert, who became assistant manager for the corporation, went out with him, and was his associate in the competing business. It is perfectly clear that they would know the avenues of the company's business and who were its customers. If they engaged in the same business, they would have the advantage of their knowledge of the company's affairs in supplanting it.

It was held in Exch. Cham. (Hitchcock v. Coker, 6 Ad. & El. 454), Tindal, C. J., delivering the opinion of the court, that the good will of a business was an asset for the protection of which the owner might lawfully obtain a covenant against future competition from one whom he took into his employment. Such cases fall within the sixth class of the classification of valid contracts by Judge Taft in United States v.

Addyston Pipe & Steel Co., 85 Fed., at page 281, 29 C. C. A. 141, 46 L. R. A. 122. This feature of such cases was commented upon by Lindley, M. R., and Rigby, L. J., in Underwood v. Barker in the Court of Appeals (1899) 1 Ch. 300, on appeal from the judgment of Keke-wich, J., reported in 68 Law J. Ch. 201. In that case the employé had gone into the service of a competitor. But it is obvious that the same reasons would apply as if he had himself gone into the competing business on his own account. The Master of the Rolls at page 307 said:

"It is to be taken as proved that it is important to the plaintiffs that their rivals should not know either to whom the plaintiffs sold their hay or where they got it from. The defendant was engaged as their clerk and foreman, and would, whilst acting as such, obtain information on these matters, and such information would, if imparted to a rival in trade, greatly benefit him and proportionately injure the plaintiffs."

And similar observations were made by Rigby, L. J., at page 309, in support of the judgment appealed from. In that case the defendant gave testimony that he had not solicited the former customers of the complainant, but his opportunity and motive for doing so were thought to justify the injunction.

As we have said, in every such case there must be more or less re-striction of competition. Whether in a particular case the restriction is so manifestly opposed to public policy as to outweigh that interest which the public has in the freedom of trade and commerce and the inviolability of contracts deliberately made upon sufficient consideration by competent persons is a vital question in determining the reasonable-ness of the restriction.

In the present instance the public has no such interest in the competi-tion of the defendant in the business in question as ought to excuse him for the violation of his contract by the employment of the special knowledge acquired by him while in the service of the complainant and which he has contracted not to use to the detriment of his employer, whether such knowledge be of what are known as technical trade secrets or of such matters as are essential to the protection of the good will of the employer's business.

If it be admitted that his employment would not have prevented the appellant from engaging in the competing business provided he had ac-cepted the alternative which would have left him free, he did not do so, but insisted on that alternative which was inconsistent with the right to engage in competition with his late employer. This right was se-cured to him by the original contract, and was as absolute as if the al-ternative had not been given by the contract. The company could not control his election. If the original contract was lawful, the final agree-ment must be.

For the reasons stated, we think the decree of the Circuit Court was right, and it is accordingly affirmed, with costs.