HALL MFG. CO. v. WESTERN STEEL & IRON WORKS et al.

(Circuit Court of Appeals, Seventh Circuit. October 5, 1915.)

No. 2165.

1. CONTRACTS ☞103—VALIDITY—LAW GOVERNING—CONTRACTS IN INTERSTATE COMMERCE.

The validity of a contract in interstate commerce made by a state corporation is not determined by the law of the state, but by general law, and if any statute applies it must be federal.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 468–476; Dec. Dig. ☞103.]

2. CONTRACTS ☞116—LEGALITY—RESTRICTIVE COVENANTS IN CONTRACTS FOR SALE OF BUSINESS.

The validity of a restrictive covenant in a contract of sale of a business and good will is to be tested, not by whether it is limited or unlimited as to time or place, but by determining whether on the facts of the particular

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

case the restraint is greater than is reasonably necessary for the protection of the purchaser.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 542–552; Dec. Dig. ☞116.]

3. CONTRACTS ☞116—LEGALITY—RESTRICTIVE COVENANTS IN CONTRACT FOR SALE OF BUSINESS.

A corporation sold one branch of its manufacturing business with the machinery, tools, and good will pertaining thereto, receiving substantially more than the value of the physical property sold, and covenanted generally not again to go into the manufacture of the articles embraced in that branch of its business. Its trade had extended into a large number of states and Canada, and was increasing. *Held*, that the covenant was no broader than the conveyed good will, and was valid and enforceable.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 542–552; Dec. Dig. ☞116.]

4. GOOD WILL ☞6—SALE—RIGHTS OF PURCHASER—RESUMPTION OF BUSINESS BY VENDOR.

The purchaser of a business and its good will is entitled to protection against an attempt by the seller to retake such good will, even though there was no express covenant against it.

[Ed. Note.—For other cases, see Good Will, Cent. Dig. §§ 2–5; Dec. Dig. ☞6.]

Appeal from the District Court of the United States for the Eastern District of Wisconsin; Ferdinand A. Geiger, Judge.

Suit in equity by the Hall Manufacturing Company against the Western Steel & Iron Works and Robert T. Jenny. Decree for defendants, and complainant appeals. Affirmed as to defendant Jenny, and reversed as to his codefendant.

Samuel H. Cady, of Green Bay, Wis. (M. W. Herrick, of Monticello, Iowa, and Max H. Strehlow and Lynn D. Jaseph, both of Green Bay, Wis., on the brief), for appellant.

George G. Greene, of Green Bay, Wis. (Jerome R. North, of Green Bay, Wis., on the brief), for appellees.

Before BAKER, KOHLSAAT, and MACK, Circuit Judges.

BAKER, Circuit Judge. This appeal is from a decree dismissing appellant's bill on final hearing.

Facts, counted on in the bill and established by the proofs, may be summarized as follows:

Appellant, an Iowa corporation, located at Monticello, was engaged in making wire stretchers, hoisting blocks, stake irons, weed pullers, and similar farm appliances, and in selling them generally wherever there was a demand.

Appellee, Western Steel & Iron Works, a Wisconsin corporation, located at De Pere, was engaged in making farm gates, trowels, spades, etc. It was organized in 1905. Prior to November 26, 1910, it also made and sold post hole augers and diggers—diggers since 1905 and augers since the beginning of 1909.

During the summer and fall of 1910 appellee was financially embarrassed, its property was under mortgage, and it was in pressing need of ready money. It solicited appellant to buy its digger and auger business, which amounted to about half of its total business. Officers of appellee visited Monticello, officers of appellant examined the prop-.

erty at De Pere, and meetings were had at Milwaukee. On November 26, 1910, appellee sold and conveyed to appellant everything pertaining to the digger and auger business, machinery, tools, dies, finished and unfinished stock, orders, patents, and "the good will of the business." Collateral to the sale of the good will appellee covenanted "to render such assistance as it reasonably can in introducing it (appellant) to the trade and in forwarding to it any orders it may receive for augers and diggers after December 10, 1910," and "not again to go into the manufacture of post hole augers and diggers."

At the time of the sale, when appellee's business in diggers was five years old and in augers two, it had marketed these articles in thirty-four of the United States and in two Canadian provinces. In considerable regions these articles cannot be used. Appellee's sales were entirely to jobbing houses. In addition to seed that had already brought forth fruit, appellee through advertisements, commission men, and the outstretched hands of jobbers had sown other seed, so that we may take the fact to be in accordance with the admitted representation of appellee's treasurer that appellee was trying to sell wherever there was a demand and that by reasonable attention the trade could be expected to extend "throughout all parts of the United States and Canada where augers and diggers can be used." So it is evident that appellee was selling and was covenanting to protect a national and international good will.

Appellant paid the agreed price, $13,500, less deductions, provided for in the contract, of about $3,000 for appellee's failure to turn over the stipulated amount of orders. The evidence in the record warrants the conclusion that appellee under the contract obtained about double the fair selling value of its worn machinery, tools, etc., and that appellant would not have purchased the physical property apart from the good will of the business and appellee's protective covenants.

This purchase was made by appellant because diggers and augers would fit in well with the lines of farm appliances it was already making and selling. Neither before nor afterwards was appellant a party to any combination or agreement for fixing prices or restraining competition. And consumers have been able to purchase diggers and augers at prices as low as formerly, under competition of the same number of independent manufacturers doing business throughout the country.

Appellant began promptly to manufacture and market the same seven styles that appellee had been supplying to the trade, and under the same seven names, which, except as to "Ideal" and "Western," for which patents were assigned to appellant, had become generic names of styles on which patents had expired.

Within a month or so appellee, with its mortgage discharged and its financial embarrassment relieved, began to manufacture all its former open styles under the old names, and to sell them wherever it could. When appellant learned of this conduct, some six months later, it protested; and, its protest being defied, this suit was begun.

Appellee Jenny was made a defendant under allegations that patents owned by appellee company stood in his name and had not been

assigned as provided for in the contract. These averments are not sustained, and the decree as to Jenny will be affirmed.

Appellee in its answer justified its conduct under an alleged rescission. But as the proofs showed that appellee was holding onto the purchase price and had made no offer to restore the status, the contract must be considered alive.

[1] Another avoidance of the necessity of facing its conduct was based on Wisconsin statutes and decisions. Section 1770b relates to foreign corporations doing business in the state. Section 1791j is under the title "Trusts, Pools, and Conspiracies." Section 1747e is part of the treatment of "Trusts and Monopolies." Cited decisions are said to prove Wisconsin's rejection of contracts in total restraint of trade. We attempt no analysis, because we assume that Wisconsin has not undertaken to regulate interstate commerce. Every part of this transaction was in interstate commerce. Even the Wisconsin trade, which had been intrastate as to appellee, was intended by the parties to be and it became interstate when conveyed to appellant. The validity of a contract in interstate commerce must be determined by the general law. If any statute applies, it must be federal. And so long as Wisconsin permits her corporations to reach out beyond the state borders and do business with citizens of other states, such corporations must be treated in regard to interstate commerce the same as any citizen of the United States.

Is appellant remediless? The trial court so decided because the protective covenants are without limitation of either time or place.

In the first reported case, that of John Dier, decided in 1415, Year Book 2 Hen. V, 5, covenants were held to be unenforceable, no matter how limited in time and place. Hull, J., said:

"In my opinion you might have demurred upon him, that the obligation is void, inasmuch as the condition is against the common law; and (per Dieu) if the plaintiff were here he should go to prison till he paid a fine to the king."

During the generations when an artisan had to pass through apprenticeship into a guild, when he was tied to his trade and place by statutes forbidding him to leave his parish under pain of pillory or prison, when if he could not stand where he was rooted he would become a public charge, it may have been right enough for the king's courts to see no public interest but the artisan's ability to pay taxes and serve the king. If, however, fifteenth century doctrines of absolutism were to govern in twentieth century conditions of democracy, a victim of a covenantor's perfidy might well prefer to settle his legal rights by the fifteenth century wager of battle. But the glory of the common law is its inherent power of growth, its adaptability to new and enlarged conditions of life, its respondence to higher standards of social and business ethics. And so during the centuries naturally there were developments and departures with respect to this ancient doctrine. It took the courts a long time to get beyond testing the validity of a restrictive covenant purely by the presence or absence of limitations. If a restraint was unlimited as to both time and place, or was unlimited as to place though not as to time, it was unenforce-

able; if limited as to both time and place, or if limited as to place, though not as to time, it was valid.

[2] But, beginning about 1830, the advent of the factory system, multifold new machines, railroads, steamships, fast mail and express service, telegraphs, telephones, wireless, trolleys, automobiles, aeroplanes, lessening space, shortening time, offering continually new and widening avenues for both labor and capital, emphasized a point of view that had been suggested in somewhat earlier times; and that is that the validity of a restrictive covenant should be tested by determining whether on the facts of the particular case the restraint is greater than is reasonably necessary for the protection of the purchaser of the business and good will. The history of the development, with its waves of progress and recession, may be traced in England and our own country in the following cases: Dier's Case (1415) supra; Ipswich Taylor's Case (1615) 11 Coke, 53; Broad v. Jollyfe (1621) Cro. Jac. 596; Mitchell v. Reynolds (1711) 1 P. Williams, 181; Bunn v. Guy (1803) 4 East, 190; Horner v. Graves (1831) 7 Bing. 735; Whittaker v. Howe (1841) 3 Beavan, 383; Mallan v. May (1843) 11 M. & W. 653; Price v. Green (1847) 16 M. & W. 346; Tallis v. Tallis (1853) 1 El. & El. 391; Harms v. Parsons (1862) 32 Beavan, 329; Leather Cloth Co. v. Lorsont (1869) 39 L. J. Ch. 86; Hagg v. Darley (1878) 47 L. J. Ch. 567; Rousillon v. Rousillon (1880) 49 L. J. Ch. 338, 14 Ch. D. 351; Baines v. Geary (1887) 35 Ch. D. 154; Mills v. Dunham (1891) 1 Ch. 576; Badische Anilin und Soda Fabrik v. Schott Segner & Co. (1892) 3 Ch. 447; Nordenfelt v. Maxim-Nordenfelt Guns and Ammunition Co. (1894) App. Cas. 535, 63 L. J. Ch. 908; Dubowski & Sons v. Goldstein (1896) 1 Q. B. 478; Underwood v. Barker (1899) 1 Ch. 300; Haynes v. Doman (1899) 2 Ch. 13; Lamson Pneumatic Tube Co. v. Phillips (1904) 91 L. T. 363; Dowden & Pook, Limited, v. Pook (1904) 1 K. B. 45; Henry Leetham & Sons, Limited, v. Johnstone-White (1907) 1 Ch. 322; Mason v. Provident Clothing & Supply Co., Ltd. (1913) A. C. 724; Nevanas & Co. v. Walker & Foreman (1914) 1 Ch. 413; Oregon Steam Navigation Company v. Winsor (1873) 20 Wall. (87 U. S.) 64, 22 L. Ed. 315; Diamond Match Co. v. Roeber (1887) 106 N. Y. 473, 13 N. E. 419, 60 Am. Rep. 464; Fowle v. Park (1888) 131 U. S. 88, 9 Sup. Ct. 658, 33 L. Ed. 67; Gibbs v. Consolidated Gas Co. of Baltimore (1888) 130 U. S. 396, 9 Sup. Ct. 553, 32 L. Ed. 979; Carter v. Alling (C. C.) 1890) 43 Fed. 208; United States Chemical Co. v. Provident Chemical Co. (C. C. 1894) 64 Fed. 946; Harrison v. Glucose Sugar Refining Co. (1902) 116 Fed. 304, 53 C. C. A. 484, 58 L. R. A. 915; National Enameling & Stamping Co. v. Haberman (C. C. 1903) 120 Fed. 415; Knapp v. S. Jarvis Adams Co. (1905) 135 Fed. 1008, 70 C. C. A. 536; Prame v. Ferrell (1909) 166 Fed. 702, 92 C. C. A. 374; Marshall Engine Co. v. New Marshall Engine Co. (1909) 203 Mass. 410, 89 N. E. 548.

Tested by the rule of reason, a restrictive covenant is not necessarily valid because it is limited in time and place. Logically the corollary follows that by the same rule of reason a restrictive covenant is not necessarily invalid because it is unlimited in time and place. A re-

straint of 500 miles and 50 years on a village doctor, who had only a local practice, would be unreasonable, because not reasonably necessary to the protection of his successor, while a general covenant by Pears Soap Company should be enforced (at least to the extent of the decreeing court's reach) because the good will of the business is world-wide and of expected indefinite continuance.

In Prame v. Ferrell, supra, a general covenant was enforced. The court construed the covenant "as limiting the restraint to the United States." In the present case the trial court accepted counsel's criticism that our brethren of the Sixth circuit were violating the rule that courts cannot lawfully remake the contract of the parties. But in our judgment the same result of enforceability is reached by taking the covenant as written, without limitation of time or place. For the covenant is neither immoral nor criminal. It stands, unless it must be overthrown on account of the covenantor's objection. His objection is based wholly on our domestic public policy. Our domestic public policy has no extraterritorial force. And therefore the limitation of the decree, if so made, comes from the inherent limitation of the covenantor's objection, not from constructively limiting his unlimited covenant.

[3] In this case, and in all of the kind, two public interests are to be balanced against the one that is opposed to restrictive covenants: Honesty and fidelity among our business men; and the interest of every one, and so of all, in being able to sell on the most advantageous terms whatever property he owns or has produced, whether tangible or intangible. Unless injury to the public manifestly outweighs the public policies of honesty and of freedom of alienation, restrictive covenants should be enforced. Here, of course, honesty condemns the conduct of appellee. Freedom of alienation is a byword, if appellee may sell property, retain the proceeds, and then repossess itself of the property with impunity. And what injury to the public was done that preponderates over honesty and freedom of alienation in the other scale? Appellee is a corporation. If any stockholder or officer is skilled in any profession or art, he is not restrained from exercising his skill by the corporation's covenant. Even the capital that was at hazard in the digger and auger branch of appellee's factory may be reinvested in the same business by the stockholders individually or collectively outside of appellee corporation. Appellee itself, rescued from financial embarrassment, and with its remaining business made sound by the use of appellant's money has been benefited. Consumers in Wisconsin and everywhere in our country get as fair prices as before, under competition of the same number of independent manufacturers. In our judgment there is no injury to the public, and the scale containing honesty and freedom of alienation strikes bottom. Inasmuch as the collateral covenants are no broader than the conveyed good will, full-grown and embryonic, they should be enforced.

[4] But, apart from the covenants, we think appellant is not remediless. If the covenants were considered void, that would not vitiate the contract in other respects, since there is nothing immoral or criminal in making such covenants. They are merely unenforce-

227 F.—38

able civilly at the worst. Western Union Telegraph Co. v. Burlington & Southwestern Ry. Co. (C. C.) 11 Fed. 1; Western Union Tel. Co. v. Kansas Pacific Ry. Co. (D. C.) 4 Fed. 284; Ft. Smith Light & Traction Co. v. Kelley, 94 Ark. 461, 127 S. W. 975; Dean v. Emerson, 102 Mass. 480; Peltz v. Eichele, 62 Mo. 171; Fishell v. Gray, 60 N. J. Law, 5, 37 Atl. 606; Rosenbaum v. U. S. Credit System Co., 65 N. J. Law, 255, 48 Atl. 237, 53 L. R. A. 449; Union Locomotive & Express Co. v. Erie Ry. Co., 35 N. J. Law, 240; Smith's Appeal, 113 Pa. 579, 6 Atl. 251; Mallan v. May, supra; Price v. Green, supra; Cheesman v. Nainby, 2 Lord Raym. 1456; Dubowski & Sons v. Goldstein, supra; Rogers v. Maddocks, [1892] 3 Ch. 346.

If one should sell a chattel, and then retake it by stealth or force or fraud, both the criminal and the civil law would lay hold. Because the retaking of a conveyed good will has not yet been included in the penal code is no reason, in our judgment, why equity should hesitate to arrest the trespass.

As to appellee Jenny the decree is affirmed; as to appellee corporation the decree is reversed, and the cause remanded for proceedings in consonance with this opinion.

---

⚹═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes