**JOHN T. STANLEY CO., Inc., v. LAGOMARS-INO.**

District Court, S. D. New York.
Sept. 21, 1931.

Fugarty, Quel & Devlin, of New York City (Lloyd P. Stryker and Seymour B. Quel, both of New York City, of counsel), for plaintiff.

Hardy, Stancliffe & Hardy, of New York City (Noah A. Stancliffe and George T. Barker, both of New York City, of counsel), for defendant.

PATTERSON, District Judge.

This is a suit to enforce a covenant by the defendant not to engage in the business of fats, grease, bone, and soap.

The defendant was formerly in the business of buying and selling fats, grease, and bones under the name of Jersey Fat Company. His business was mainly in New York City and the cities of New Jersey near by, but it also took him as far as Rye, N. Y., and New Brunswick, N. J. The property used in the business consisted of two trucks for collecting material, the cost of which when new was about $7,000.

The plaintiff is a New York corporation, engaged in the rendering business. As part of such business it buys and sells fats, grease, bone, soap, and kindred articles. Its principal place of business is in New York City. It apparently does business also in the part of New Jersey near New York City, but beyond that the territorial extent of its business was not shown.

In August, 1925, the defendant was approached by one of the plaintiff's employees and the subject of selling out to the plaintiff was discussed. A sale was arranged at the price of $10,000. The negotiations resulted in the execution by the defendant of two agreements on August 26, 1925, and it is upon these agreements that the plaintiff bases its case. By the first, the defendant for the sum of $10,000 sold his business and good will to one Carty, a dummy acting in the plaintiff's behalf and known to be such by the defendant. The agreement describes the business as "the grease, fat and bone collecting business now conducted by me in the State of New Jersey and in the State of New York." The defendant also agreed to continue to be employed in the business at a salary of $50 a week, under the direction of Carty or his assigns. By the second agreement, the defendant agreed not to engage in the business "of buying, selling, dealing, or otherwise trading in fats, grease, bone, soaps of any kind, or any commodity kindred or allied to the same." This agreement further provided that this and other restrictions should apply "within the State of New Jersey and the State of New York and to be binding for a term of ten years from the date hereof." The agreement also recited that the covenant should not be affected by the fact that the defendant was to be employed by Carty and that it should run after the defendant might leave such employ. Carty assigned his rights under these agreements to the plaintiff, as was contemplated all along.

For some seven months thereafter, the defendant continued to drive one of his old trucks and to do business under his old trade-name, Jersey Fat Company; but at the direction of one of the plaintiff's foremen, he spent his time trying to get business from customers of competitors of the plaintiff. It seems that the plaintiff had some sort of understanding with rivals not to seek business from one another's customers, and this activity by the defendant was to secure for the plaintiff customers of the others in breach of the understanding, while the plaintiff ostensibly was living up to it. After some seven months, this pretense that the defendant was still in business for himself was abandoned and the defendant began to work for the plaintiff in the usual way, buying and collecting fats, grease, and bones on one of its trucks. The employment continued at the rate of $50 a week until October 30, 1930, when the defendant was discharged. Evidence was introduced tending to show that the discharge was for cause. The defendant then commenced business on his own account, buying and selling fats, grease, and bones in New York City and in nearby places in New Jersey. The plaintiff promptly commenced this suit to enforce the covenant and asked for an injunction and accounting.

The plaintiff's case was proved by the agreements admittedly signed by the defendant. The agreement not to re-engage in the business was ancillary to the sale of the business and good will. Under settled principles

such a covenant attached to the sale of a going business is valid, prima facie at least (Diamond Match Co. v. Roeber, 108 N. Y. 473, 13 N. E. 419, 60 Am. Rep. 464; United States v. Addyston Pipe & Steel Co. (C. C. A.) 85 F. 271, 281, 46 L. R. A. 122), and unless one or more of the matters relied upon as defenses to the suit are established the plaintiff is entitled to the relief demanded in the bill.

■■■ 1. The defendant pleaded, and offered testimony tending to prove, that when he signed the two agreements he was told by the plaintiff's agent, one Daiber, that the agreements called for his employment by the plaintiff for the term of ten years, and that otherwise he would not have signed. The defendant and Cella, his brother-in-law, who also was present at the signing, testified to this effect. This is equivalent to an assertion that the writing does not represent the real agreement of the parties and was executed through fraud or mistake, and if established it is of course a good defense to a suit to enforce the written agreement. John T. Stanley Co. v. Lagomarsino, 49 F. (2d) 702, wherein the Circuit Court of Appeals reversed a preliminary injunction granted in this case. I am convinced, however, that the defendant was not in fact overreached or imposed upon as to the contents of the papers and that no employment for ten years was in fact ever agreed upon. The testimony of the defendant and of Cella was sharply contradicted by that of Diamond, the plaintiff's attorney, and by Daiber, who was in charge of the matter for the plaintiff. Both testified that the defendant and Cella were given copies of the agreements to read, that Daiber read both agreements aloud in the presence of all four, and that Daiber did not tell the defendant that the employment would be for ten years. I am satisfied that these two witnesses were telling the truth about the entire transaction. In addition, the probabilities are in favor of their version. The defendant is an able, intelligent man. He could read and speak English. He was also experienced in business. Prior to this time he had sold for $14,000 a bus line which he had built up in New Jersey. Cella also was capable and well versed in business affairs, and was present for the specific purpose of seeing that the defendant was not tricked or deceived. It is unlikely that under these circumstances the defendant would have signed papers in a $10,000 deal without being aware of what they contained. Upon this disputed question of fact, therefore, I find that the defendant knew what the provisions of the agreements were when he signed them. There was no agreement by the plaintiff to employ him for ten years, and it is therefore unnecessary to consider whether the discharge in 1930 was for cause or without cause. This defense fails and the counterclaim seeking reformation of the contract by adding a clause obliging the plaintiff to employ the defendant for ten years must be dismissed.

■■■ 2. The other defense pleaded is that the agreements were obtained by the plaintiff in an effort to gain a monopoly. There was no proof of the alleged monopolistic contracts or of the conspiracy to suppress competition unreasonably. In any event, the matters pleaded do not render the agreements between the plaintiff and the defendant unlawful. There is nothing on the face of the agreements that shows them to be a part of an unlawful scheme. It is settled law that where the contract sued upon is lawful, the collateral question whether the plaintiff is violating the Sherman Anti-Trust Act (15 USCA § 1 et seq.) or similar state statutes will not be inquired into. Wilder Mfg. Co. v. Corn Products Co., 236 U. S. 165, 35 S. Ct. 398, 59 L. Ed. 520, Ann. Cas. 1916A, 118; Gilbert v. American Surety Co. (C. C. A.) 121 F. 499, 61 L. R. A. 253; Camors-McConnell Co. v. McConnell (C. C. A.) 140 F. 412.

■■■ 3. At the trial the defendant urged that the covenant not to engage in business was unreasonable in two respects and therefore void. The contention is that by its terms the covenant kept the defendant from engaging in the soap business, among others, and that he had never been engaged in that business; also, that the territorial restriction covers the states of New York and New Jersey, whereas the defendant had done business only in New York City and in places within a relatively small area around it. It is said that in both respects the covenant went beyond proper limits and consequently is unenforceable. No such defense was pleaded in the answer. It may well be that in a case of this sort it is up to the plaintiff to show the reasonableness of the covenant, and that the defendant need not affirmatively plead its unreasonableness. But if the rule is otherwise, it is clear in this case that the plaintiff has not been prejudiced in any way by the omission of this matter from the answer, and in the exercise of the discretion which I have under rule 19 of the Equity Rules (28 USCA § 723), I will allow an amendment to the answer embodying this matter as an additional defense. The point will therefore be treated on the merits.

It is everywhere recognized that the restriction against the vendor's resuming business must be a reasonable one, adapted to the fair protection of the good will sold. If it is broader and restrains the vendor beyond the bounds of the business sold, it is not valid in its entirety. The covenant may thus be objectionable because too ambitious in respect to space or to time or to businesses covered. If the crossroads grocer on selling out bound himself never to engage in any kind of business in the United States, none would be so bold as to rise up and defend the agreement in its entirety. At this point we may eliminate the plaintiff's contention that in judging the reasonableness of the restricted area, the court may take into account not only the extent of the vendor's business, but also the extent of the purchaser's business. There is no merit in it, and the cases cited by the plaintiff are all distinguishable. The authorities make it clear that in cases involving vendor and purchaser the restriction must be no wider than is necessary to protect the business sold.

Diamond Match Co. v. Roeber, supra; United States v. Addyston Pipe & Steel Co., supra; Perry v. Burns, 101 N. J. Eq. 409, 139 A. 41; Robinson v. Suburban Brick Co. (C. C. A.) 127 F. 804; Hall Mfg. Co. v. Western Steel & Iron Works (C. C. A.) 227 F. 588, L. R. A. 1916C, 620; Williston on Contracts, § 1641. If, therefore, the present covenant means that the defendant shall be barred throughout New Jersey and New York from resuming his old business, it clearly is objectionable, since the old business covered only relatively small areas in those two states. The defendant argues that the effect of this is to render the entire covenant void, while the plaintiff submits that the court should, if it deems the covenant too broad, cut it down to reasonable limits and enforce it as so reduced.

The authorities are divided on the point. The old rule unquestionably was that while the courts would uphold part of the covenant where the parties had put it in divisible form and one part went too far, this could not be done where the covenant was indivisible. Williston on Contracts, § 1659; Page on Contracts, § 788. The first case seems to have been Price v. Green, 16 M. & W. 346, where a London and Westminster perfumer on selling out agreed not to carry on the perfumer's trade in London or Westminster or within 600 miles of those places. The agreement was held severable as to the territory covered by the restriction and good as to London and Westminster, though void as to the 600-mile zone. The court said: "The question, therefore, seems to be one of construction, whether, from the language used, the covenant be capable of division" (page 353). There are many cases wherein the language of the parties has been construed as divisible and the covenant therefore partially valid, and the courts will strain to put such a construction upon the covenant so as to save it in part. See Trenton Potteries Co. v. Oliphant, 56 N. J. Eq. 680, 39 A. 923, and Fleckenstein Bros. Co. v. Fleckenstein, 76 N. J. Law, 613, 71 A. 265, 24 L. R. A. (N. S.) 913. As illustrating the other branch of the rule of severability, Consumers Oil Co. v. Nunnemaker, 142 Ind. 560, 41 N. E. 1048, 51 Am. St. Rep. 193, is an instance. There an oil dealer in Hammond sold his business and agreed to refrain from re-entering such business in the state of Indiana, the city of Indianapolis excepted. He broke his agreement and opened up in Hammond. Concededly a covenant affecting Hammond alone would have been valid. It was held that the covenant covered too great a territory and was indivisible and wholly void. Althen v. Vreeland (N. J. Ch.) 36 A. 479, and Wyder v. Milhomme, 96 N. J. Law, 500, 115 A. 380, are to the same effect.

On the other side, there are two recent cases in which it is held that a covenant covering too large a territory and indivisible so far as the language used by the parties goes may be cut down by the courts to a part of the specified territory and enforced as so reduced. In Hill v. Central West Public Service Co. (C. C. A.) 37 F.(2d) 451, an ice dealer who had done business in Dallas covenanted on selling the business not to re-engage in it in the state of Texas. The Circuit Court of Appeals of the Fifth Circuit held that, although the covenant was too broad, it would be deemed valid and effective to prevent the vendor from resuming the ice business in Dallas. Edgecomb v. Edmonston, 257 Mass. 12, 153 N. E. 99, is the other case. There a covenant which covered the state of Massachusetts and was indivisible in terms was held valid as to Boston. In Prame v. Ferrell, 166 F. 702, the Circuit Court of Appeals of the Sixth Circuit left the question open (page 704). There has also been criticism of the rule of severability in England, where the attack, however, is on the other branch of the rule. The tendency there is toward holding the entire covenant void, at least in employer and employee

cases, even though the parties have split it into valid and void parts. See Mason v. Provident Clothing Co., [1913] A. C. 724; Goldsoll v. Goldman, [1914] 2 Ch. 603; Attwood v. Lamont, [1920] 3 K. B. 571. The old rule is also criticized in Williston on Contracts, § 1660.

There seem to be no authorities in the Supreme Court or in the Circuit Court of Appeals of this circuit. Oregon Navigation Co. v. Winsor, 20 Wall. 64, 22 L. Ed. 315, may be cited for either rule (see pages 70, 71 of 20 Wall.). If it were necessary for me to choose between the two lines of authority, I would be inclined to follow those holding that where the restraint is over an excessive territory, it should be enforced as to the part of such territory where restraint is reasonable, irrespective of the divisible character of the language used in the agreement. In employer and employee cases, special considerations may play a part the other way, but it seems to me that in cases involving vendor and purchaser this is the fairer and more sensible rule, for the reasons set forth by Professor Williston. But the present case does not require a ruling on this point. So far as the restraint covers the soap business, it is void; but even under the old rule of severability the validity of the restraint as to fats, grease, and bone business is not thereby affected. Bromley v. Smith, [1909] 2 K. B. 235; Page on Contracts, § 789. And as to territory it seems reasonably clear that the defendant's agreement, under ordinary rules of construction, does not run throughout the states of New Jersey and New York, but was intended to cover only those portions of the two states where he had previously done business in fats, grease, and bone.

To ascertain the meaning of the parties, the two instruments are of course to be read together. They are between the same parties, were executed at one sitting, and form parts of the same transaction. Positype Corporation v. Mahin (C. C. A.) 32 F.(2d) 202; Metropolitan Securities Co. v. Ladd (C. C. A.) 173 F. 269. Now in the first agreement the business which was being sold is termed "the grease, fat and bone collecting business now conducted by me in the State of New Jersey and in the State of New York." And in the second agreement the defendant's covenant says: "All of the above restrictions to apply within the State of New Jersey and the State of New York." It is significant that the territorial description

is the same in the two clauses. It is only reasonable to suppose that the parties had the same area in mind in both clauses. They did not say that the restrictions should apply "throughout" these two states, or to all places within the two states. Full effect may be given to the restrictive provision by construing it as covering the same places as where the defendant was then carrying on his business in New Jersey and New York. This construction also has the merit that it makes the agreement valid, and as between two possible constructions, one rendering the contract valid and the other rendering it void, the courts will adopt the one rendering it valid. See Trenton Potteries Co. v. Oliphant, supra; Fleckenstein Bros. Co. v. Fleckenstein, supra. This conclusion is in line with what was decided in Cropper v. Davis (C. C. A.) 243 F. 310. See also Prame v. Ferrell, supra; Hall Mfg. Co. v. Western Steel & Iron Works, supra, where covenants apparently unrestricted as to territorial scope were construed as limited.

I am of the opinion that the covenant was intended by the parties to restrain the defendant only as to the territory wherein he had carried on business in New Jersey and New York, and that it is therefore valid.

4. It was also urged by the defendant at the close of the trial that the suit should be dismissed because the plaintiff did not come into court with clean hands. Attention is directed to the fact that the plaintiff's employees, prior to the making of the agreements, had followed the defendant around on his routes to see who his customers were and to solicit their business. It is also said that the plaintiff's purpose in acquiring the defendant's business was to have the defendant, who to all appearances would still be independent, solicit business in the plaintiff's behalf from customers of its competitors in violation of a gentleman's understanding with such competitors. The evidence seems to indicate that this was one of the plaintiff's objects, although not its sole object, in purchasing the defendant's business. The fact that the purchase was made in the name of a dummy, together with the instructions which the plaintiff forthwith gave to the defendant to solicit business from customers of one or more of its rivals, has some significance. This practice was continued for some seven months and then abandoned. The contention that the plaintiff does not come into court with clean hands is available to the defendant although not pleaded. When the

facts disclosed at the trial warrant the application of the maxim, the court will of its own motion deny relief. Bentley v. Tibbals (C. C. A.) 223 F. 247.

In my opinion, however, the case does not call for application of the "clean hands" rule. To induce denial of relief, the plaintiff's conduct must be such that the prosecution of his rights will of itself involve the protection of wrongdoing. Primeau v. Granfield (C. C.) 180 F. 847, 852. The wrongful act must affect the very matter in litigation, as distinguished from general iniquitous conduct. Trice v. Comstock (C. C. A.) 121 F. 620, 61 L. R. A. 176; Knapp v. S. Jarvis Adams Co. (C. C. A.) 135 F. 1008; Camors-McConnell Co. v. McConnell, supra. There is nothing reprehensible in the fact that the plaintiff continued the defendant's business in the latter's name for a time. I take it that purchasers of going concerns frequently conduct business in the vendor's name in order to get full benefit of the good will or for other meritorious reasons. Here we have the additional feature that the plaintiff made use of the defendant's business to violate the understanding with competitors to let one another's customers alone. If that understanding had been a lawful agreement, we might have a different question; but from the little that we know about it, it seems to have been an agreement or understanding plainly opposed to public policy and manifestly unlawful. The violation of such an agreement by stealth may have been "ungentlemanly," but I can hardly say that such violation makes the plaintiff's hands unclean as regards this suit. Suppose retailers have an understanding to maintain prices at artificial levels. Is it iniquitous for one of them to cut prices covertly, thereby doing (though not openly, it is true) what the law commands him to do?

5. The defendant finally submits that the contract under all the circumstances is unconscionable and therefore should not be enforced by a court of equity. Pope Mfg. Co. v. Gormully, 144 U. S. 224, 12 S. Ct. 632, 36 L. Ed. 414. I have weighed the matter carefully, and I am not prepared to say that the plaintiff has dealt unfairly with the defendant. I cannot say that the price paid to the defendant was inadequate or the agreement improvident.

The plaintiff will have a decree, limited in territory to New York City, Jersey City, Perth Amboy, New Brunswick, and Paterson, and in kinds of business to the fat, grease, and bone business, and in time to August 26, 1935. Submit decree on two days' notice.