CROPPER et al. v. DAVIS.

(Circuit Court of Appeals, Eighth Circuit. April 14, 1917.)

No. 4498.

1. CONTRACTS ☞117(2, 7)—RESTRAINT OF TRADE—LIMITATION AS TO TERRITORY.
    Plaintiff was engaged in a rating and collecting business, in which he solicited retail merchants, etc., as subscribers to a league, secured from such subscribers a list of unpaid accounts, and listed such debtors as did not pay when notified in a credit book or rating directory. In such business he used forms, the result of 17 years or more experience; the forms being changed from time to time. He employed defendant in such business for 5 years, under a contract by which defendant agreed to devote all of his time to such business, and during such time to work at no other employment and engage in no other business, except when plaintiff allowed him to withdraw for the purpose of entering a line of business or the employment of any individual, firm, or company not using the plan, forms, or plan and forms of plaintiff in competition thereof. Held that, it being possible to ascertain by evidence in what territory plaintiff did business, and whether another business of the same type would be in competition with him, the contract was limited as to territory, and moreover, in view of the peculiar character of the business, the contract would not be invalid, if unlimited as to territory.

2. EQUITY ☞65(2)—GROUNDS FOR DENIAL OF RELIEF—UNCLEAN HANDS.
    Though debtors who paid were not specially rated, where those who failed to pay were rated in accordance with a key whereby it was shown how many members had reported the debtor, whether the account was disputed or outlawed, whether the debtor was bankrupt, and whether letters to the debtor were returned, there was such a rating as, in the absence of fraud, complied with subscribers' contracts and prevented the denial of injunctive relief, on the ground that plaintiff did not come into court with clean hands, in that he had been guilty of false and fraudulent representations because his business was not collecting by rating, or a system of rating, and because there was no rating in connection with the plan.

Appeal from the District Court of the United States for the District of Nebraska; Page Morris, Judge.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Suit by Will M. Davis against Walter L. Cropper and another. Decree for plaintiff, and defendants appeal. Affirmed.

Hugh A. Myers and Carl T. Self, both of Omaha, Neb., for appellants.

Irving F. Baxter, of Omaha, Neb. (Brown, Baxter & Van Dusen, of Omaha, Neb., on the brief), for appellee.

Before SANBORN and SMITH, Circuit Judges, and AMIDON, District Judge.

SMITH, Circuit Judge. Will M. Davis, the appellee and plaintiff below, is and has been for many years a resident and citizen of the state of Illinois, and Walter L. Cropper and the Mutual Rating & Adjustment Association are the appellants and defendants below, and they for several years have been residents and citizens of the state of Nebraska. The plaintiff has for between 15 and 20 years been conducting, with Chicago as his headquarters, a collection and so-called rating business throughout the North Central states under the name of the National Rating League. In connection therewith the plaintiff secured a copyright upon a book called "Collecting by Rating" in 1910. On February 7, 1910, the defendant Walter L. Cropper entered into a contract with the National Rating League by which he agreed to devote all his time during the next five years to the business of the League under its instructions, and during said time to work at no other employment and engage in no other business—

"except when the National Rating League allows me to withdraw for the purpose of entering a line of business, or the employment of any individual, firm. or company, neither of which uses the plan, forms, or plan and forms, used by the National Rating League, in competition therewith. The National Rating League, by allowing me to engage at such other employment or business, does not thereby forfeit its rights under this contract."

Cropper remained in the employment of the League until about March 18, 1912. Shortly after leaving their employ he, as owner and manager, started a substantially similar business to that conducted by the League at Omaha, Neb., under the name of the Mutual Rating & Adjustment Association. In his new business he used substantially all the forms devised by plaintiff, and embraced in his copyrighted book mentioned, and so far as can be told from the record copied the entire system of the plaintiffs. An agreed statement of facts was filed in the District Court, from which the following is taken:

(1) It is hereby stipulated and agreed that the allegations contained in complainant's bill of complaint, for the purpose of review, are to be taken and considered as true in all respects, and that the copy of the contract between complainant, Will M. Davis, and the defendant Walter L. Cropper, referred to therein as "Exhibit G" and attached to the said bill, is a true copy of the instrument signed by said parties upon the date it bears, and that all other exhibits attached to said bill of complaint are true copies thereof.

(2) Complainant transacted his business under the name and style of "National Rating League." The defendant W. L. Cropper and Bessie M. Cropper transacted their business under the name and style

of "Mutual Rating & Adjustment Association." Neither the League
nor the Association were incorporated. The character or method of
complainant's business was known to the business world by the term
"Collecting by Rating." The defendants also used this term as de-
scriptive of their business.

(3) That the general nature and plan of the business of the parties
to this action is to secure contracts from retail merchants, doctors,
and dentists, throughout the country, agreeing to become members
and subscribers to said league and association, respectively, and at the
same time, to secure from such subscribers a list of their unpaid ac-
counts and take these up with such members and subscribers through
a system of correspondence. These unpaid accounts, after notices to
debtors, were printed in a rating book which is furnished to said
subscribers. The solicitors are paid the compensation provided for
under their contract—"Exhibit G"—according to the number of ac-
counts they secure, when 10 or more of said accounts are turned in,
either by the solicitor or the merchants; frequently the solicitor was
paid in advance by his employer. Complainant and defendant re-
ceived their compensation out of collections made upon accounts sent
in; they receiving, per agreement with subscriber, the first $10 col-
lected. The accounts, when turned into the office, were taken up by
means of regular correspondence for the purpose of preparing and
getting data for the rating book. If the accounts were received at the
office, the debtors are notified to settle the same at once, if correct,
as otherwise their name would appear in the rating book as owing the
account. The solicitors were furnished with the blank forms referred
to in the bill of complaint, together with the rating book, which shows
what business the man is in, and whether or not the account is past due
or disputed; and upon the listing blank the subscriber is supposed
to list all such accounts so turned into the office and he is furnished
a rating notice, a personal notice sent out by the subscriber to his
debtor, and with a rating statement, which the subscriber uses to make
report to the office when the account has been adjusted. The debtor
is supposed to adjust the account directly with the subscriber. Com-
plainant relied upon members making reports to his office of collec-
tions made from debtors whose names and accounts had been sent it.

(4) The forms used by complainant are the result of 17 years or
more of experience and as the result of trying out different forms and
changing them from time to time, but with few changes made during
the past 6 years. Many of said forms were printed in the red book
entitled "Collecting by Rating," attached to the bill as "Exhibit A."
The book was duly copyrighted by complainant under the laws of the
United States in the year 1910. No names were printed in the red
guide credit book or rating directory, other than those sent in by the
merchants to whom accounts or sums of money were due and owing
by the parties therein designated. If, after sending notice to the
debtor and his name was printed in the rating directory or credit book,
he later paid the amount owing by him to the subscriber, the name
was then omitted from such directory or record. The name of the
book or directory used by the complainant, in which the names of
delinquent debtors were listed, was "Red Guide and Credit Record";

the name of the book used by the defendants for the same purpose was "Rating Directory."

The District Court granted an injunction enjoining the defendants from carrying on the business in violation of the terms and conditions of the contract dated February 7, 1910, up to and including February 6, 1915, and enjoined the defendants—

"from in any wise using, giving away, or distributing in any business conducted by them, or either of them, the said book entitled 'Collecting by Rating,' and the book entitled 'Red Guide and Credit Record,' and from in any wise using, giving away, and distributing the forms, notices, and printed matter contained in said book, 'Collecting by Rating,' and that said defendants, and each of them, * * * their agents and servants, and all persons acting by or under their authority, be and they are hereby perpetually enjoined and restrained from in any wise making use in their business of the term 'Collecting by Rating.'"

A proper assignment of errors was filed in the District Court, but rule 24 of this court contains the following provision:

"2. This brief shall * * * contain in order here stated: * * * Second. A specification of the errors relied upon which * * * in cases brought up by appeal the specification shall state, as particularly as may be, in what the decree is alleged to be erroneous."

In the appellants' brief there is nothing which is called a specification of errors, but there is a heading "Appellants' Contentions." The most liberal construction of the rule would reduce us to considering these "contentions" and no other. Under these headings the appellants set forth the following:

"(1) That the clause heretofore quoted in said contract is unreasonable, unenforceable, and void as against public policy, and in restraint of trade; that it is without limitation as to space; that it is unlimited not only to the United States, but as to the entire globe.

"(2) That the appellee should have no standing in a court of equity, for the reason, as is shown by the evidence in the exhibits, embodied within the abstract of the agreed statement of facts, that he was guilty of false representations in the conduct of his business."

It will be observed that there is no contention that plaintiffs did not copyright the book called "Collecting by Rating," that the same contained the forms used by the defendants and defendants thereby infringed the copyright, and that they were therefore rightfully enjoined from continuing to use the same, and these questions are not for consideration by us. It has been held, however, that a copying of any substantial part of a copyrighted book is an infringement. G. & C. Merriam Co. v. United Dictionary Co., 76 C. C. A. 470, 146 Fed. 354; Harper & Bros. v. M. A. Donohue & Co. (C. C.) 144 Fed. 491, affirmed by the Circuit Court of Appeals, 76 C. C. A. 678, 146 Fed. 1023; List Pub. Co. v. Keller (C. C.) 30 Fed. 772; Ford v. Charles E. Blaney Amusement Co. (C. C.) 148 Fed. 642; Brightley v. Littleton (C. C.) 37 Fed. 103.

[1] We will take up, then, first the plaintiffs' contention that the provision of the contract in question is invalid, because it is not limited in the territory to which it applies within the United States or the earth. The first defect in the contention made on this subject is that the facts alleged do not exist. The contract provides that, if the de-

fendant is released from his agreement to devote five years to the business of the League under its instructions to enter another line of business, it must be with an individual, firm, or company "neither of which uses the plan, forms, or plan and forms, used by the National Rating League, *in competition therewith:*" It being possible for the court to ascertain by evidence in what territory the plaintiff did business, and whether another business of the same type would be in competition with the plaintiff, the contract was clearly limited to the territory thus described, and defendant was precluded from engaging in the like business as the plaintiff, as clearly as though it had done so by geographical description. There is therefore no basis in fact for this contention.

It appears from the bill and is admitted that the defendants were carrying on business in Nebraska, North and South Dakota, Iowa, Kansas, and Oklahoma, and this is a part of the territory in which according to the admitted allegations the plaintiff was doing business. It was first held in the fifteenth century that contracts of the character here referred to were invalid as in restraint of trade, but the lapse of five centuries has greatly modified the holding upon this subject. In Standard Oil Co. of New Jersey v. United States, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, and United States v. American Tobacco Co., 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663, the Supreme Court construed the Sherman Anti-trust Law (Act July 2, 1890, c. 647, 26 Stat. 209) in accordance with the common law to require that the restraint to make it illegal should amount to unreasonable or undue restraint of trade as it held the common law had done. This change from the holding of the fifteenth century had been gradual. The first departure from the old rule was to hold that such contracts were valid if reasonably limited as to time and place. The contract here in question was limited as to time to the life of the contract and fully complied with the holdings of that period. About 1830 a second change began to be apparent in the rulings of the courts upon the subject and now the rule is that a restrictive contract should be tested by determining on the facts of the particular case whether the restriction upon one party is greater than is reasonably necessary for the protection of the other party. Hall Mfg. Co. v. Western Steel & Iron Works, 142 C. C. A. 220, 227 Fed. 588, L. R. A. 1916C, 620. In Prame v. Ferrell, 92 C. C. A. 374, 166 Fed. 702, it was held that, though there was no specific limitation as to territory in the contract, it was valid at least throughout the United States. In Harrison v. Glucose Sugar Refining Co., 53 C. C. A. 484, 488, 116 Fed. 304, 308, 58 L. R. A. 915, it is said:

"It is urged that the contract in question is one in restraint of trade because of the covenant that during the stipulated time of service the appellant would not, directly or indirectly, become interested in the specified business within a radius of 1,500 miles from the city of Chicago otherwise than under his engagement with the appellee. The doctrine of restraint of trade had its birth in conditions anciently obtaining, and now greatly changed. Then the area of trade was confined within narrow territorial bounds. Intercommunication has become largely extended, and trades anciently limited to a small locality have become national in their extent. The rule is bottomed upon the consideration whether such a covenant was broader than the covenantee required for his protection. The restraint must not be arbitrary, but should be limited. It must be reasonable with respect to time and to the

area within which the covenantee prosecutes his business. Beyond this, restraint is unnecessary and invalid."

In Knapp v. S. Jarvis Adams Co., 70 C. C. A. 536, 540, 135 Fed. 1008, 1012, it is said:

"With respect to the territory to which the restriction should apply, the rule has always been that it might extend to the limits wherein the plaintiff's trade would be likely to go. The changes which have marked the course of judicial decisions in modern times seem to consist in conforming the application of the rule to the constant development of the facilities of commerce and the enlargement of the avenues of trade. In Harrison v. Glucose Sugar Refining Co., 53 C. C. A. 484, 116 Fed. 304, 58 L. R. A. 915, a valuable case upon this subject, and having many analogies to the present, Judge Jenkins refers to several cases of high authority in which there was no territorial restriction whatever."

In Carter v. Alling (C. C.) 43 Fed. 208, 211, Judge Blodgett says:

"The only defense seriously insisted upon in the case is that this contract is void as a contract in restraint of trade. There is no difference between counsel as to the tenor and scope of the earlier English doctrine upon the subject of contracts like that now under consideration. It was held that they were contrary to public policy and void; but, as the later cases came before the court, this doctrine was much relaxed, and the first modification of the doctrine was the recognition of the validity of contracts of this nature where the restraint was limited as to space or time, and reasonable in its nature, and the reported cases are abundant in which an undertaking by one person not to carry on a given business within a limited area and within a fixed period of time has been sustained, and a breach of the undertaking enjoined, in a court of equity. In later years a further relaxation of the old rule has grown up both in England and America, and the courts have repeatedly recognized the validity of contracts in restraint of trade throughout an entire state or country, where such restraint was not unreasonable, in view of the nature and extent of the business of the covenantee."

In Gibbs v. Baltimore Gas Co., 130 U. S. 396, 409, 9 Sup. Ct. 553, 557 (32 L. Ed. 979), it is said:

"The decision in Mitchel v. Reynolds, 1 P. Wms. 181, s. c., Smith's Leading Cases (7th Eng. Ed.) 407 (8th Am. Ed.) 756, is the foundation of the rule in relation to the invalidity of contracts in restraint of trade; but as it was made under a condition of things, and a state of society, different from those which now prevail, the rule laid down is not regarded as inflexible, and has been considerably modified. Public welfare is first considered, and if it be not involved, and the restraint upon one party is not greater than protection to the other party requires, the contract may be sustained. The question is, whether, under the particular circumstances of the case and the nature of the particular contract involved in it, the contract is, or is not, unreasonable."

In the House of Lords in the case of Nordenfelt v. Maxim Nordenfelt Guns & Ammunition Company, [1894] Law Reports, Appealed Cases, 535, the whole history of this question was carefully examined, and it was held that under the modern rule a contract that a patentee and manufacturer of guns and ammunition for purposes of war, in connection with a sale of the business, that he would not for 25 years engage, except in behalf of his vendee, either directly or indirectly, in the business of a manufacturer of guns or ammunition, was valid and binding upon him, though the contract was unrestricted as to space, and that he could be enjoined from a violation of his contract in that regard. The opinions in that case are quite instructive as to the history

of this form of litigation and the development of the law pertaining thereto. In Joyce on Injunctions, p. 688, § 457, it is said:

"The former general rule was that, where an affirmative engagement of personal service could not be enforced by a decree for specific performance, a court of equity would not enjoin the breach of a collateral negative covenant by the obligee not to serve elsewhere during the period of the affirmative engagement; but, in later times, such negative covenants have been enforced by injunction, where the complainant shows sufficient equities."

In 14 Ruling Case Law, p. 388, § 88, it is said:

"Where a contract of employment provides for the rendition of services for a specified period and that the employé will not engage in the same business during that period, the right of the employer to an injunction, in aid of specific performance, is regarded as governed by the rules relating to the specific performance of contracts for personal service."

It should be borne in mind that a distinction must exist between compelling one to keep his contract of employment and forbidding him to work for his rival in the same line. The first would require involuntary servitude in violation of the Thirteenth Amendment to the Constitution, while the second would not be subject to that criticism. In view of the lapse of time there can be no question as to the injunction except as to the damages for its wrongful procurance. In view of the peculiar character of the business here involved, we are of the opinion that the contract would not be invalid if unlimited in the territory covered by it, but as already indicated we think the territory is accurately defined in the contract.

[2] Without assuming the correctness of the further propositions announced by the appellants, we deem the following sufficient answer thereto. It is said the appellee represented to his customers and to the public generally that he was carrying on a business of "Collecting by Rating" when as a matter of fact he neither made nor published a "rating of any individual or firm." It is true those who paid were not specially rated. They were treated upon the theory that the fact that a man's reputation was never called in question is a good rating. As to those who failed to pay they were rated in accordance with a key set forth in the "Red Guide and Credit Record." This key showed that those marked "B" had been reported by two members, and those marked from "C" to "I" had respectively been reported by three to nine members; those marked "z" were disputed accounts, "y" letters returned, "x" outlawed accounts, and "bk" bankrupt. This was such a rating as, in the absence of fraud, would comply with the League's contracts.

The defendants apparently rely on the proposition that he who comes into a court of equity must come with clean hands, and here chiefly rely on matters heretofore stated that by the publication or use of the copyrighted forms, together with the red book and credit guide and collecting by rating, the appellee has been guilty of false and fraudulent representations to the public in his business; that the appellee's plan of business is not collecting by rating, or system of rating, and there was no rating in connection with his plan. In Wilder Manufacturing Co. v. Corn Products Co., 236 U. S. 165, 172, 35 Sup. Ct. 398, 400 (59 L. Ed. 520, Ann. Cas. 1916A, 118), the court said:

"And this is but a form of stating the elementary proposition that courts may not refuse to enforce an otherwise legal contract because of some indirect benefit to a wrongdoer which would be afforded from doing so or some remote aid to the accomplishment of a wrong which might possibly result—doctrines of such universal acceptance that no citation of authority is needed to demonstrate their existence, especially in view of the express ruling in Connolly v. Union Sewer Pipe Co., 184 U. S. 540 [22 Sup. Ct. 431, 46 L. Ed. 679]."

In Talbot v. Independent Order of Owls, 136 C. C. A. 268, 220 Fed. 660, this court said:

"Nor does the evidence which is found in this record upon which the defendants rely to defeat the plaintiffs, and to bring this suit under the ban of the principle, 'He who comes into equity must come with clean hands,' sustain that defense. That principle does not repel all sinners from the precincts of courts of equity, nor does it disqualify any plaintiff from obtaining full relief there who has not done inequity in the very transaction concerning which he complains. The wrong which may be invoked to defeat him must have an immediate and necessary relation to the equity for the enforcement of which he prays."

The decree of the District Court is affirmed.