**NATIONAL HOMES CORPORATION, an Indiana corporation, Plaintiff,**

v.

**LESTER INDUSTRIES, INC., a Virginia corporation, and Lawson L. Lester, Jr., Defendants.**

**Civ. A. No. 66-C-20-D.**

United States District Court
W. D. Virginia,
Danville Division.

March 19, 1968.

Edwin B. Meade, Danville, Va., for plaintiff.

John W. Carter, Danville, Va., for defendants.

## MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.*

In 1946 Lawson L. Lester, Jr., caused to be formed a business named "Lester Brothers, Incorporated." By 1959 this business had developed into one that made prefabricated housing units of the open-frame construction type. In 1959 National Homes, Inc., the world's largest manufacturer of prefabricated housing units, decided to expand its operation in the South. The majority of its prefabricated housing units were of closed-frame construction. Open-frame construction, however, was a substantial

* Sitting by designation.

part of their business. In expanding its operations, National Homes contacted Lawson L. Lester, Jr., with respect to selling his business to it, for the main operations of Lester Brothers, Inc., were in Virginia and the southern states. The negotiations as to the sale of Lester Brothers, Inc., to National Homes took place in the late spring and early summer of 1959.[1] These negotiations between Lester and National resulted in a sales agreement and plan of reorganization as to Lester Brothers, Inc., each dated June 30, 1959, and Lawson Lester executed the foregoing agreement and, in addition thereto, an employment agreement. It is clear that these contracts were meant to be the complete arrangement between the parties.[2]

By the sales agreement dated June 30, 1959, National Homes was to receive at least 80% of the stock in Lester Brothers, Inc., from the latter's stockholders, in exchange for stock in National Homes.[3] The agreement also stated the obligations of National Homes, after the closing to be:

"(a) The management of National shall recommend to its shareholders at the next regular or special meeting thereof that L. L. Lester, Jr., be elected to the board of directors of National and shall use its best efforts to effect such election;

"(b) National shall cause Lester to continue the employment of L. L. Lester, Jr., in his present capacity and under the terms of his present employment at a salary of $50,000 per year for 2 years, to continue the employment of Victor Lester in his present capacity and under the terms of his present employment at a salary of $35,000 per year for 2 years, provided in the case of L. L. Lester, Jr.,

that National and its subsidiaries shall have full use of all patents and pending applications for patents owned by said L. L. Lester, Jr., without payment of royalties or other consideration during said period of employment.

"(c) National will not, without the consent of L. L. Lester, Jr., cause the removal of the following employees of Lester from their present employment: Ben Harris, Louise M. Bowen, James A. Shockley, Thomas M. Robbins, and Lem Mann."

Under the above agreement National Homes acquired 4,968 shares of all issued and outstanding stock of all classes (5,000 shares) of Lester Brothers, Inc., on July 17, 1959. At the same time Lawson L. Lester, Jr., acquired from National a restricted stock option certificate for 4,634 shares of National's class B common stock at a price of $17.42 a share, or eighty-five percent of the market value of such stock on the effective date of said certificate. National subsequently fulfilled all of the other requirements imposed upon it under the provisions quoted above.

As previously mentioned, an employment agreement between the parties was likewise executed on July 17, 1959, reading, in part, as follows:

"THIS AGREEMENT, is executed between NATIONAL HOMES CORPORATION of Lafayette, Indiana, as the owner of Eighty Per Cent (80%) of the capital stock of Lester Brothers, Incorporated, and in behalf of Lester Brothers, Incorporated, as the Employer and LAWSON L. LESTER, JR., as the Employee.

"In consideration of the mutual covenants of the parties, it is agreed as follows:

"1. Lester Brothers, Incorporated, hereby employs Lawson L. Lester, Jr.,

1. One version of those events was given by Lawson Lester.

2. This is obvious from the provisions as to the salary to be paid Lawson L. Lester, Jr., for the two contracts dovetail. Furthermore, according to Lester, the con-

tractual documents were all signed simultaneously.

3. The rate of exchange was one share of Lester Brothers stock for 48 shares of class A common stock of National.

in his present executive capacity at present location as president of said corporation. The employee hereby agrees to accept such employment under the terms and conditions of this agreement, and he further agrees to devote his full time and efforts to the business affairs of the Employer and to promote its best interest during the term of his employment.

"2. The term of the employment herein contracted for shall be ten (10) years, beginning as of the date of this agreement. Employer agrees to pay the Employee a salary of $50,000 per year during the first two (2) years of said employment and a minimum of $35,000.00 per year during the remaining eight (8) years of said employment. Such salary shall be paid in semi-monthly installments, on the 15th day and the last day of the month.

\*    \*    \*    \*    \*    \*

"4. Anything herein to the contrary notwithstanding, it is agreed between the parties that at the end of the first two (2) years of employment, this agreement can be terminated by mutual agreement of the parties. In the event of such termination or if the contract is mutually terminated at any other time during said ten (10) year period, then it is agreed by Lawson L. Lester, Jr., that during the period ending ten (10) years from the date hereof, he will not engage directly or indirectly, anywhere in the United States, in any enterprise in competition with the business of National Homes Corporation; namely the business of manufacture, sale and distribution of prefabricated housing units, nor will he have any financial interest nor be employed in any such competing enterprise."

The last paragraph quoted above was added to the contract on the very day of its execution in the office of W. R. Broaddus, the very capable attorney who was representing Lawson L. Lester, Jr., in this matter. Both Lawson L. Lester, Jr., and his attorney, Broaddus, were fully aware of the meaning and intent of this proviso, despite Mr. Lester's protestations to the contrary.[4]

Shortly thereafter, on April 23, 1960, National Homes received the remaining 32 shares of stock of Lester Brothers; thus making the latter a wholly-owned subsidiary of National. From this time forward there appears to have been a gradual movement toward consolidation of the various units of National Homes into a business with its principal control and administrative operation in Lafayette, Indiana. This is evidenced by the use of IBM computers; the issuance of all checks to personnel from Lafayette, Indiana; the authorization of capital expenditures by a Management Committee in Lafayette; the borrowing of money by subsidiaries from National Homes, and so forth. Much of this centralization did not affect Lester Brothers until January of 1965. Up until that time Lester Brothers had a free hand in most areas, especially in buying equipment, but at that time it was to be subject to the capital expenditure authorization. It is clear that the management of National Homes and Lawson L. Lester, Jr., did not see eye-to-eye on these issues and, as Lester stated, he was finally told by George Price, the President of National Homes, "If you don't resign, I'm going to fire you." Contributing to the friction between these parties was the fact that National Homes was displeased that Lawson L. Lester, Jr., had allowed certain debts owed to Lester Brothers by United States Lumber Company[5] to remain unpaid for a considerable length of time. Finally, the above events culminated in the resignation of Lawson L. Lester, Jr., as President of Lester Broth-

4. Lawson L. Lester, Jr., contends that the proviso was meant to apply only to closed-frame construction, and not to open-frame construction.

5. Lester was the main stockholder and President of United States Lumber Company.

ers on April 1, 1965. On May 5, 1965, the parties (Lester, Lester Brothers and National Homes) signed an agreement that is a mutual cancellation of the employment agreement of July 17, 1959. This simply ratified the action of April 1, 1965, and in no way affects the rights of the parties.

Lawson L. Lester, Jr., however, was not to remain in retirement long for, on July 6, 1965, Lester Industries, under the leadership of Lester as President and principal stockholder, received its certificate of incorporation from the Virginia State Corporation Commission. The charter for Lester Industries states the reasons for its creation as follows:

"(b) The purpose or purposes for which the corporation is organized are as follows: To manufacture, buy, sell and deal in building materials of every kind and description, both at wholesale and at retail; to buy, sell and deal in land and improvements of every kind and description; to execute deeds, deeds of trust, mortgages, bills of sale, notes, bonds or other evidences of indebtedness, both as maker or drawer and as principal or accommodation party; to lease or let real estate and improvements; to engage in earth moving, landscaping or reforestation; to buy, sell or deal in equipment and machinery necessary and proper to carry out the above purposes; and to do any and all things which a natural person might do to promote the corporate purposes hereinabove set out."

Under this broad grant of power, Lester Industries proceeded to engage in the business of manufacturing, selling and erecting prefabricated housing units of the open-frame construction variety. Since February of 1966 it has done so in collaboration with Royal Homes, Inc., a corporation in which Lester Industries has a half interest, the other half belonging to Michael B. Banes. While Royal Homes has been a separate corporation since April 7, 1967, the date of issuance of a certificate by the Virginia State Corporation Commission, it has worked almost exclusively on projects for Lester Industries, Inc., and there can be no question as to the close connection between the two as to the production of complete prefabricated housing units.[6] There can also be no doubt that such production is very similar to that done by Lester Brothers.[7] This competition is intensified by the fact that Lawson L. Lester, Jr., is quite familiar with the price setup of Lester Brothers and, as a member of the Board of Directors at National, had access to all important records maintained by National. Furthermore, Lester has not only been seen talking with builder-dealer representatives of National Homes at the latter's convention in Martinsville on September 29, 1966, but he has also contacted builder-dealer representatives of Lester Brothers endeavoring to procure their business.[8] Lawson L. Lester, Jr., has hired numerous personnel that were formerly employed by Lester Brothers. The most blatant example of this arises in the case of Sam Atkins, Jr., who came to work for Lester Industries from Lester Brothers. The employment agreement between Sam Atkins, Jr., and Lester Industries,

---

6. The two corporations share the same building in Collinsville, and, in fact, the offices of Royal Homes, Inc., are just down the corridor from those of Lester Industries. The latter does the accounting for Royal Homes and is compensated therefor. Many of the designs of Royal Homes formerly had the specifications of Lester Industries on the back of them. The overlap between the two has been well substantiated.

7. Note the exhibits and testimony as to how closely they resemble each other. With the exception of the design known as the "Swinger" or "Lively One," which is a closed-frame construction prefabricated house introduced in August of 1967, National Homes has engaged in both types of construction.

8. See the bulletin to dealers dated April 27, 1966.

dated March 23, 1966, stated the following:

"That the party of the first part [Lester Industries] does hereby agree to employ the said party of the second part [Atkins], * * * to pay the party of the second part for said employment a salary of One Hundred Thirty-five ($135.00) per week, with an additional bonus of Five ($5.00) Dollars on each house shipped by Lester Industries, Inc., to builder now doing business with Lester Bros. except for three builders now doing business with Lester Industries and/or Royal Homes, Inc. These three builders are J. L. Richardson, Mayodan, N. C.; John Pool, Brookneal, Va.; and Gibbs Realty, Morganton, N. C."

Thus, it is obvious that Lawson L. Lester, Jr., through Lester Industries and/or Royal Homes, Inc., is competing with Lester Brothers, Inc., and, to a lesser degree, with National Homes, Inc. The latter has now brought suit to enjoin Lester from continuing this competition in violation of the restrictive covenant dated July 17, 1959.[9]

■■■ After a thorough study of the present situation, the Court has reached the conclusion that the damage done to Lester Bros., Inc., cannot be taken into account, for the simple reason that Lester Bros., even though a wholly-owned subsidiary of National Homes, is a separate and distinct corporate entity, and the mere fact that the financial and managerial structure of Lester Bros. Inc., and National Homes are closely intertwined is no reason to allow the actual or potential damages done to the former

to run to the benefit of the latter, for Lester Bros. could have been made a party to an action brought in the state court.[10] This Court does not believe that the corporate veil should be pierced so as to benefit the party which has established or maintained the existence of a separate corporate structure for its own benefit. Although in a different factual context, the Supreme Court enunciated this principle in Schenley Distillers Corporation v. United States, 326 U.S. 432, 436–437, 66 S.Ct. 247, 249, 90 L.Ed. 181, as follows:

"Appellant urges that we disregard the separate corporate entities which are to pay compensation to appellant for the transportation and treat the corporations controlled by appellant's parent as one single commercial enterprise. While corporate entities may be disregarded where they are made the implement for avoiding a clear legislative purpose, they will not be disregarded where those in control have deliberately adopted the corporate form in order to secure its advantages and where no violence to the legislative purpose is done by treating the corporate entity as a separate legal person. One who has created a corporate arrangement, chosen as a means of carrying out his business purposes, does not have the choice of disregarding the corporate entity in order to avoid the obligations which the statute lays upon it for the protection of the public."

The defendants have made much of the difference between open and closed-frame construction in regards to whether a house is prefabricated or not. The Court, however, is not impressed by this

---

9. The action likewise sounds in damages. A default judgment was entered in favor of National by reason of the persistent failure and/or refusal of defendants to respond to orders of court entered by Judges Michie and Dalton. This Court did not feel that the default carried with it the right to injunctive relief. The damage issue has not been heard.

10. The plaintiff has chosen this forum in which to present his case; it has obviously done so for tactical reasons or for reasons known only to it, and the fact that making Lester Bros. a party to the suit would divest this court of jurisdiction because of the lack of complete diversity is no matter of concern for this court.

distinction. A simple definition of a prefabricated home is the following:

"A prefabricated home is one having walls, partitions, floors, ceilings, and/or roof composed of sections or panels varying in size which have been fabricated in a factory prior to errection on the building foundation. This is in contrast to the conventionally built home which is constructed piece by piece on the site." [11]

It should be noted that no reference is made to the difference in construction of wall panels, for no valid reason exists for making such a distinction. It is clear that National Homes manufactured and sold both open and closed-frame construction at the time of the signing of the contract, and that Lawson L. Lester, Jr., knew or should have known this fact to be true. Furthermore, at the time of sale Lester Bros., Inc., was making open-frame homes only, and this alone suggests that National had not limited itself solely to closed-frame construction. While much testimony has been adduced as to the difference between the two types of wall construction, the Court is definitely of the opinion that the parties meant to include both types in the competitive restriction clause of the contract. The Court also believes that the so-called "package deal" now presented to the public by Lester Industries, Inc., so closely resembles the product manufactured and sold by National Homes as to be in direct competition therewith.

The issuance of an injunction is within the discretion of the court, and before it can issue same, it must ascertain the validity of the restrictive covenant upon which such relief is based. In this regard, the Court finds that the covenant found in the employment agreement is ancillary to the sale of Lester Brothers, Inc., and, consequently, that it is supported by adequate consideration.

In order to be valid, the restrictions of the covenant must be reasonable as to both area and time. These two elements must be correlated to the interests of the employer, the employee, and the general public. In De Long Corporation v. Lucas, 176 F.Supp. 104, 121 (S.D.N.Y., 1959), the test has been stated as follows:

"An employee's covenant not to compete is not unreasonable and will be enforced if (1) it is necessary for the proper protection of the employer's competitive position, (2) its impact upon the former employee is not such as to restrict unduly his opportunities for making a livelihood and (3) is not unreasonably restrictive on its impact upon the public."

The reasons for National Homes' insistence on this covenant are quite obvious. National was fully aware that Lawson L. Lester, Jr., had been quite successful in the prefab business in past years. Furthermore, it knew that Lester, as a director of National, would become familiar with the modus operandi of National; e. g., the financial structure, the trade secrets, the price scale, etc. Upon termination of the employment contract Lester would be in an excellent position to establish, or work for, a company competing with National Homes in the prefabricated housing business.

In order to insure National against such an occurrence, the parties agreed to a prohibition that barred Lester from competing in the business of the manufacture, sale and distribution of prefabricated housing units with National Homes anywhere in the United States for ten years. This territorial restraint does not prevent Lester from entering the prefabricated housing business *as long as it is not in competition with National Homes* or is outside the United States. Consequently, it is valid from the employer's viewpoint, since it is

11. Commercial Standard CS125 47—published by United States Department of Commerce.

necessary in its fullest extent to protect National's legitimate interest; namely, the loss of business due to competition from Lawson Lester. The area is not too vast when viewed from the facts peculiar to this case; i. e., Lester was not only an executive of Lester Brothers, but he was paid directly by National's check and served as a member of National's board of directors.

Nor is the time limitation too great or unreasonable in light of the facts stated above. In addition to being on the payroll and a director of National, Lawson Lester was also the direct cause of the sale of Lester Brothers to National, and it is quite probable that a residue of the good will of the business remained with him. Furthermore, one should note that the present covenant runs no longer than the stated maximum period of employment under the contract. While the contract was for ten years, it was only after two years that said contract was terminable by the parties, and the restraint never became operative until the contract was actually terminated on April 1, 1965. This left only four years, three months, and seventeen days for Lester to bide his time before entering in competition with National Homes in this narrow field.

Likewise, this covenant is not unduly harsh or oppressive to Lawson Lester, for he not only received adequate consideration for the sale of his business, but, as an astute businessman, he is quite capable of earning a comfortable living in numerous ways.[12] The prefabricated housing business is just one of many fields of endeavor in which Lawson Lester can utilize his business acumen, and the issuance of an injunction preventing his competition with National Homes in this area would not unduly restrict his business dealings or deprive him of his opportunities for making a livelihood.

The public interest cannot be said to suffer in any way. No monopoly has been established. No shortage of the employee's type of services will be brought about by enjoining the defendant.

■ From the foregoing discussion one can ascertain that the restrictive covenant must be held valid for it was reasonably necessary for the protection of the employer, and it was not unreasonably restrictive upon the rights of the employee, nor invalid as against public policy. Consequently, all the requisites for an injunction have been met with the exception of finding irreparable damage to the plaintiff. The rule of law in this area has been stated thusly:

"That irreparable injury will be sustained by the former employers if the employee be allowed to violate reasonable restrictive covenants of this character is well recognized. Sustaining this principle and the right to injunctive relief are the following decisions:

" 'It is not necessary to show actual damage by instances of successful competition; it is sufficient if such competition, in violation of the covenant, may result in injury. The inability to prove actual damages is one of the grounds upon which equity intervenes. The covenant is lawful as to area and time, and the defendant should be held to compliance.' "

Worrie v. Boze, 191 Va. 916, 62 S.E.2d 876, 882 (1951). See also, 43 C.J.S. Injunctions § 84, pp. 566–567, 573.

■ The Court believes this to be an accurate statement of the law, and that the present case falls squarely into the rule therein stated. There is no need to reiterate the facts which show irreparable damage, for the whole record is replete with the operations of Lester Industries, Inc., and their similarity to those of National Homes. Where both Lester Industries, Inc., and National Homes are active in an area, the operations of the former are obviously detrimental to the business of the latter. This is true even though no special or

12. Lester has been in other facets of the lumber business for years.

actual damages have been shown.[13] Perhaps it should be noted that such damages are difficult to measure and are continuous so as to force the plaintiff into maintaining multiple suits in order to recover damages. This fact further supports the plaintiff's demand for injunctive relief. In the final analysis, however, there has never really been any doubt about the existence of irreparable injury.

We turn to the areas in which competition has occurred between National Homes and Lester Industries, Inc., and/or Lawson L. Lester, Jr. Lester Industries has conducted most of its business in Virginia, North Carolina and South Carolina with a smattering of sales in West Virginia and Maryland. National Homes has been busy in Maryland, West Virginia, and Virginia; however, it has not done business in North Carolina and South Carolina.[14]

Thus, Lester Industries and its principal officer cannot be enjoined from continuing its business dealings in North Carolina and South Carolina. The defendants have conceded, in argument, that National's business is quite substantial in West Virginia and Maryland, and that, consequently, they have no objection to the issuance of an injunction which prohibits their functioning in those two states, if the restrictive covenant is valid. Likewise, plaintiff, in its brief, has abandoned any claim to violations of the restrictive covenant in North Carolina, South Carolina, and the District of Columbia.

Thus, the main bone of contention is the state of Virginia, for both do a considerable amount of business there. National Homes has sold its product mainly in northern and central Virginia with sales down through the Shenandoah Valley and as far south as Blacksburg. In contrast to this, Lester Industries has sold the largest quantity of its product in southwestern Virginia, with occasional sales in the Shenandoah Valley. There is no question that competition between National Homes and Lester Industries does exist in several areas of Virginia. Consequently, Lester Industries and Lawson L. Lester, Jr., should be enjoined from manufacturing, selling and delivering prefabricated housing units, directly or indirectly, where it will interfere with the business of National Homes, *but not* Lester Bros. In order to avoid a conflict even as to spheres of influence in regard to these parties, this Court will order Lester Industries and Lawson Lester, Jr., to cease doing any prefabricated housing business in the state of Virginia except in the following counties, and the cities and incorporated towns located within the external boundaries of said counties: Henry, Pittsylvania, Halifax, Mecklenburg, Brunswick, Lunenburg, Campbell, Amherst, Bedford, Franklin, Patrick, Carroll, Grayson, Roanoke, and Washington.[15]

This injunction includes not only Lawson L. Lester, Jr., but all employees of Lester Industries while employed by same, and all employees of Royal Homes, Inc. This restriction is issued under the following rule:

"A stranger to the covenant may, however, properly be enjoined from aiding the covenantor in violating his covenant or receiving any benefit therefrom. So, a stranger to the covenant may well be enjoined from, in conjunc-

---

13. As noted previously, National has had very little opportunity to discover the extent of actual damage, if any, because of the breakdown in discovery processes afforded by the Federal Rules of Civil Procedure.

14. An exhibit filed with the deposition of George E. Price taken on February 22, 1967, shows that from April 1, 1965, to December 31, 1965, National Homes com-

pleted 124 package deal transactions in Virginia; 158 in West Virginia; and 599 in Maryland. For the year 1966, National delivered 54 package deals in Virginia; 213 in West Virginia; and 537 in Maryland.

15. The Court has used this method, for it is simpler than listing the areas that are forbidden to Lester and his company.

tion with the covenantor, or with his assistance, conducting a business in competition with the covenantee." Annot., 94 A.L.R. 341, 345 (1935).

In construing the territorial limits of the restraint, the restriction should be reasonably necessary for the protection of the employer's business. Whittenberg v. Williams, 110 Colo. 418, 135 P.2d 228 (1943). We need not pass upon the situation as to what would happen if Lester Industries or Lawson L. Lester, Jr., elects to start doing business in New Mexico where National is not similarly engaged. As stated in Knapp v. S. Jarvis Adams Co., 135 F. 1008, 1012 (6 Cir., 1905):

"With respect to the territory to which the restriction should apply, the rule has always been that it might extend to the limits wherein the plaintiff's trade would be likely to go. The changes which have marked the course of judicial decisions in modern times seem to consist in conforming the application of the rule to the constant development of the facilities of commerce and the enlargement of the avenues of trade."

As to the excepted counties in Virginia, together with the cities and incorporated towns within the external boundaries thereof, it can only be said that the competition is between Lester Industries and Lester Brothers, the latter being the wholly-owned subsidiary of National. Since National, aside from its wholly-owned subsidiary, has expressed no interest in dissolving the corporate entity of Lester Brothers or in otherwise entering the same area in the name of National, the restrictive covenant cannot be enforced in the excepted portions of Virginia. This statement is, of course, made without prejudice to National's right, should it be so advised, to proceed in the proper state court with Lester Brothers, Inc., as a party to the litigation.

Counsel will prepare and present the appropriate injunctive order.